19 U.S. 264 (1821)
6 Wheat. 264
COHENS
v.
VIRGINIA.
Supreme Court of United States.
February 18, 1821.
March 2, 1821.
March 5, 1821.
*290 Mr. Barbour, for the defendant in error.
Mr. D.B. Ogden, for the plaintiffs in error.
Mr. Webster, contra.
*375 Mr. Chief Justice MARSHALL delivered the opinion of the Court.
This is a writ of error to a judgment rendered in the Court of Hustings for the borough of Norfolk, on an information for selling lottery tickets, contrary to an act of the Legislature of Virginia. In the State Court, the defendant claimed the protection of an act of Congress. A case was agreed between the parties, which states the act of Assembly on which the prosecution was founded, and the act of Congress on which the defendant relied, and concludes in these words. "If upon this case the Court shall be of opinion that the acts of Congress before mentioned were valid, and, on the true construction of those acts, the lottery tickets sold by the defendants as aforesaid, might lawfully be sold within the State of Virginia, notwithstanding the act or statute of the general assembly of Virginia prohibiting such sale, then judgment to be entered for the defendants: And if the Court should be of opinion that the statute or act of the General Assembly of the State of Virginia, prohibiting such sale, is valid, notwithstanding the said acts of Congress, then judgment to be entered that the defendants are guilty, and that the Commonwealth recover against them one hundred dollars and costs."
*376 Judgment was rendered against the defendants; and the Court in which it was rendered being the highest Court of the State in which the cause was cognizable, the record has been brought into this Court by writ of error.[a]
The defendant in error moves to dismiss this writ, for want of jurisdiction.
In support of this motion, three points have been made, and argued with the ability which the importance of the question merits. These points are 
1st. That a State is a defendant.
2d. That no writ of error lies from this Court to a State Court.
3d. The third point has been presented in different forms by the gentlemen who have argued it. The counsel who opened the cause said, that the want of jurisdiction was shown by the subject matter of the case. The counsel who followed him said, that jurisdiction was not given by the judiciary act. The Court has bestowed all its attention on the arguments of both gentlemen, and supposes that their tendency is to show that this Court has no jurisdiction of the case, or, in other words, has no right to review the judgment of the State Court, because neither the constitution nor any law of the United States has been violated by that judgment.
The questions presented to the Court by the two *377 first points made at the bar are of great magnitude, and may be truly said vitally to affect the Union. They exclude the inquiry whether the constitution and laws of the United States have been violated by the judgment which the plaintiffs in error seek to review, and maintain that, admitting such violation, it is not in the power of the government to apply a corrective. They maintain that the nation does not possess a department capable of restraining peaceably, and by authority of law, any attempts which may be made, by a part, against the legitimate powers of the whole, and that the government is reduced to the alternative of submitting to such attempts, or of resisting them by force. They maintain that the constitution of the United States has provided no tribunal for the final construction of itself, or of the laws or treaties of the nation; but that this power may be exercised in the last resort by the Courts of every State in the Union. That the constitution, laws, and treaties, may receive as many constructions as there are States, and that this is not a mischief, or, if a mischief, is irremediable. These abstract propositions are to be determined; for he who demands decision without permitting inquiry, affirms that the decision he asks does not depend on inquiry.
If such be the constitution, it is the duty of the Court to bow with respectful submission to its provisions. If such be not the constitution, it is equally the duty of this Court to say so, and to perform that task which the American people have assigned to the judicial department.
*378 1st. The first question to be considered is, whether the jurisdiction of this Court is excluded by the character of the parties, one of them being a State, and the other a citizen of that State?
The second section of the third article of the constitution defines the extent of the judicial power of the United States. Jurisdiction is given to the Courts of the Union in two classes of cases. In the first, their jurisdiction depends on the character of the cause, whoever may be the parties. This class comprehends "all cases in law and equity arising under this constitution, the laws of the United States, and treaties made, or which shall be made, under their authority." This clause extends the jurisdiction of the Court to all the cases described, without making in its terms any exception whatever, and without any regard to the condition of the party. If there be any exception, it is to be implied against the express words of the article.
In the second class, the jurisdiction depends entirely on the character of the parties. In this are comprehended "controversies between two or more States, between a State and citizens of another State," "and between a State and foreign States, citizens or subjects." If these be the parties, it is entirely unimportant what may be the subject of controversy. Be it what it may, these parties have a constitutional right to come into the Courts of the Union.
The counsel for the defendant in error have stated that the cases which arise under the constitution must grow out of those provisions which are capable *379 of self-execution, examples of which are to be found in the 2d section of the 4th article, and in the 10th section of the 1st article.
A case which arises under a law of the United States must, we are likewise told, be a right given by some act which becomes necessary to execute the powers given in the constitution, of which the law of naturalization is mentioned as an example.
The use intended to be made of this exposition of the first part of the section, defining the extent of the judicial power, is not clearly understood. If the intention be merely to distinguish cases arising under the constitution, from those arising under a law, for the sake of precision in the application of this argument, these propositions will not be controverted. If it be to maintain that a case arising under the constitution, or a law, must be one in which a party comes into Court to demand something conferred on him by the constitution or a law, we think the construction too narrow. A case in law or equity consists of the right of the one party, as well as of the other, and may truly be said to arise under the constitution or a law of the United States, whenever its correct decision depends on the construction of either. Congress seems to have intended to give its own construction of this part of the constitution in the 25th section of the judiciary act, and we perceive no reason to depart from that construction.
The jurisdiction of the Court, then, being extended by the letter of the constitution to all cases arising under it, or under the laws of the United States, it follows that those who would withdraw *380 any case of this description from that jurisdiction, must sustain the exemption they claim on the spirit and true meaning of the constitution, which spirit and true meaning must be so apparent as to overrule the words which its framers have employed.
The counsel for the defendant in error have undertaken to do this; and have laid down the general proposition, that a sovereign independent State is not suable, except by its own consent.
This general proposition will not be controverted. But its consent is not requisite in each particular case. It may be given in a general law. And if a State has surrendered any portion of its sovereignty, the question whether a liability to suit be a part of this portion, depends on the instrument by which the surrender is made. If, upon a just construction of that instrument, it shall appear that the State has submitted to be sued, then it has parted with this sovereign right of judging in every case on the justice of its own pretensions, and has entrusted that power to a tribunal in whose impartiality it confides.
The American States, as well as the American people, have believed a close and firm Union to be essential to their liberty and to their happiness. They have been taught by experience, that this Union cannot exist without a government for the whole; and they have been taught by the same experience that this government would be a mere shadow, that must disappoint all their hopes, unless invested with large portions of that sovereignty which belongs to independent States. Under the influence of this opinion, and thus instructed by experience, *381 the American people, in the conventions of their respective States, adopted the present constitution.
If it could be doubted, whether from its nature, it were not supreme in all cases where it is empowered to act, that doubt would be removed by the declaration, that "this constitution, and the laws of the United States, which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, any thing in the constitution or laws of any State to the contrary notwithstanding."
This is the authoritative language of the American people, and, if gentlemen please, of the American States. It marks, with lines too strong to be mistaken, the characteristic distinction between the government of the Union, and those of the States. The general government, though limited as to its objects, is supreme with respect to those objects. This principle is a part of the constitution, and if there be any who deny its necessity, none can deny its authority.
To this supreme government ample powers are confided, and if it were possible to doubt the great purposes for which they were so confided, the people of the United States have declared, that they are given "in order to form a more perfect union, establish justice, ensure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of liberty to themselves and their posterity."
*382 With the ample powers confided to this supreme government, for these interesting purposes, are connected many express and important limitations on the sovereignty of the States, which are made for the same purposes. The powers of the Union, on the great subjects of war, peace, and commerce, and on many others, are in themselves limitations of the sovereignty of the States, but in addition to these, the sovereignty of the States is surrendered in many instances where the surrender can only operate to the benefit of the people, and where, perhaps, no other power is conferred on Congress than a conservative power to maintain the principles established in the constitution. The maintenance of these principles in their purity, is certainly among the great duties of the government. One of the instruments by which this duty may be peaceably performed, is the judicial department. It is authorized to decide all cases of every description, arising under the constitution or laws of the United States. From this general grant of jurisdiction, no exception is made of those cases in which a State may be a party. When we consider the situation of the government of the Union and of a State, in relation to each other, the nature of our constitution, the subordination of the State governments to that constitution; the great purpose for which jurisdiction over all cases arising under the constitution and laws of the United States, is confided to the judicial department; are we at liberty to insert in this general grant, an exception of those cases in which a State may be a *383 party? Will the spirit of the constitution justify this attempt to control its words? We think it will not. We think a case arising under the constitution or laws of the United States, is cognizable in the Courts of the Union, whoever may be the parties to that case.
Had any doubt existed with respect to the just construction of this part of the section, that doubt would have been removed by the enumeration of those cases to which the jurisdiction of the federal Courts is extended, in consequence of the character of the parties. In that enumeration, we find "controversies between two or more States, between a State and citizens of another State," "and between a State and foreign States, citizens, or subjects."
One of the express objects, then, for which the judicial department was established, is the decision of controversies between States, and between a State and individuals. The mere circumstance, that a State is a party, gives jurisdiction to the Court. How, then, can it be contended, that the very same instrument, in the very same section, should be so construed, as that this same circumstance should withdraw a case from the jurisdiction of the Court, where the constitution or laws of the United States are supposed to have been violated? The constitution gave to every person having a claim upon a State, a right to submit his case to the Court of the nation. However unimportant his claim might be, however little the community might be interested in its decision, the framers of our constitution thought it necessary for the purposes of justice, to provide a *384 tribunal as superior to influence as possible, in which that claim might be decided. Can it be imagined, that the same persons considered a case involving the constitution of our country and the majesty of the laws, questions in which every American citizen must be deeply interested, as withdrawn from this tribunal, because a State is a party?
While weighing arguments drawn from the nature of government, and from the general spirit of an instrument, and urged for the purpose of narrowing the construction which the words of that instrument seem to require, it is proper to place in the opposite scale those principles, drawn from the same sources, which go to sustain the words in their full operation and natural import. One of these, which has been pressed with great force by the counsel for the plaintiffs in error, is, that the judicial power of every well constituted government must be co-extensive with the legislative, and must be capable of deciding every judicial question which grows out of the constitution and laws.
If any proposition may be considered as a political axiom, this, we think, may be so considered. In reasoning upon it as an abstract question, there would, probably, exist no contrariety of opinion respecting it. Every argument, proving the necessity of the department, proves also the propriety of giving this extent to it. We do not mean to say, that the jurisdiction of the Courts of the Union should be construed to be co-extensive with the legislative, merely because it is fit that it should be so; but we mean to say, that this fitness furnishes an argument *385 in construing the constitution which ought never to be overlooked, and which is most especially entitled to consideration, when we are inquiring, whether the words of the instrument which purport to establish this principle, shall be contracted for the purpose of destroying it.
The mischievous consequences of the construction contended for on the part of Virginia, are also entitled to great consideration. It would prostrate, it has been said, the government and its laws at the feet of every State in the Union. And would not this be its effect? What power of the government could be executed by its own means, in any State disposed to resist its execution by a course of legislation? The laws must be executed by individuals acting within the several States. If these individuals may be exposed to penalties, and if the Courts of the Union cannot correct the judgments by which these penalties may be enforced, the course of the government may be, at any time, arrested by the will of one of its members. Each member will possess a veto on the will of the whole.
The answer which has been given to this argument, does not deny its truth, but insists that confidence is reposed, and may be safely reposed, in the State institutions, and that, if they shall ever become so insane or so wicked as to seek the destruction of the government, they may accomplish their object by refusing to perform the functions assigned to them.
We readily concur with the counsel for the defendant, *386 in the declaration, that the cases which have been put of direct legislative resistance for the purpose of opposing the acknowledged powers of the government, are extreme cases, and in the hope, that they will never occur; but we cannot help believing, that a general conviction of the total incapacity of the government to protect itself and its laws in such cases, would contribute in no inconsiderable degree to their occurrence.
Let it be admitted, that the cases which have been put are extreme and improbable, yet there are gradations of opposition to the laws, far short of those cases, which might have a baneful influence on the affairs of the nation. Different States may entertain different opinions on the true construction of the constitutional powers of Congress. We know, that at one time, the assumption of the debts contracted by the several States, during the war of our revolution, was deemed unconstitutional by some of them. We know, too, that at other times, certain taxes, imposed by Congress, have been pronounced unconstitutional. Other laws have been questioned partially, while they were supported by the great majority of the American people. We have no assurance that we shall be less divided than we have been. States may legislate in conformity to their opinions, and may enforce those opinions by penalties. It would be hazarding too much to assert, that the judicatures of the States will be exempt from the prejudices by which the legislatures and people are influenced, and will constitute perfectly impartial tribunals. In many States the judges are dependent for office and *387 for salary on the will of the legislature. The constitution of the United States furnishes no security against the universal adoption of this principle. When we observe the importance which that constitution attaches to the independence of judges, we are the less inclined to suppose that it can have intended to leave these constitutional questions to tribunals where this independence may not exist, in all cases where a State shall prosecute an individual who claims the protection of an act of Congress. These prosecutions may take place even without a legislative act. A person making a seizure under an act of Congress, may be indicted as a trespasser, if force has been employed, and of this a jury may judge. How extensive may be the mischief if the first decisions in such cases should be final!
These collisions may take place in times of no extraordinary commotion. But a constitution is framed for ages to come, and is designed to approach immortality as nearly as human institutions can approach it. Its course cannot always be tranquil. It is exposed to storms and tempests, and its framers must be unwise statesmen indeed, if they have not provided it, as far as its nature will permit, with the means of self-preservation from the perils it may be destined to encounter. No government ought to be so defective in its organization, as not to contain within itself the means of securing the execution of its own laws against other dangers than those which occur every day. Courts of justice are the means most usually employed; and it is reasonable to expect that a government should repose on its *388 own Courts, rather than on others. There is certainly nothing in the circumstances under which our constitution was formed, nothing in the history of the times, which would justify the opinion that the confidence reposed in the States was so implicit as to leave in them and their tribunals the power of resisting or defeating, in the form of law, the legitimate measures of the Union. The requisitions of Congress, under the confederation, were as constitutionally obligatory as the laws enacted by the present Congress. That they were habitually disregarded, is a fact of universal notoriety. With the knowledge of this fact, and under its full pressure, a convention was assembled to change the system. Is it so improbable that they should confer on the judicial department the power of construing the constitution and laws of the Union in every case, in the last resort, and of preserving them from all violation from every quarter, so far as judicial decisions can preserve them, that this improbability should essentially affect the construction of the new system? We are told, and we are truly told, that the great change which is to give efficacy to the present system, is its ability to act on individuals directly, instead of acting through the instrumentality of State governments. But, ought not this ability, in reason and sound policy, to be applied directly to the protection of individuals employed in the execution of the laws, as well as to their coercion. Your laws reach the individual without the aid of any other power, why may they not protect him from punishment for performing his duty in executing them?
*389 The counsel for Virginia endeavour to obviate the force of these arguments by saying, that the dangers they suggest, if not imaginary, are inevitable, that the constitution can make no provision against them, and that, therefore, in construing that instrument, they ought to be excluded from our consideration. This state of things, they say, cannot arise until there shall be a disposition so hostile to the present political system as to produce a determination to destroy it, and, when that determination shall be produced, its effects will not be restrained by parchment stipulations. The fate of the constitution will not then depend on judicial decisions. But, should no appeal be made to force, the States can put an end to the government by refusing to act. They have only not to elect Senators, and it expires without a struggle.
It is very true that, whenever hostility to the existing system shall become universal, it will be also irresistible. The people made the constitution, and the people can unmake it. It is the creature of their will, and lives only by their will. But this supreme and irresistible power to make or to unmake, resides only in the whole body of the people, not in any sub-division of them. The attempt of any of the parts to exercise it is usurpation, and ought to be repelled by those to whom the people have delegated their power of repelling it.
The acknowledged inability of the government, then to sustain itself against the public will, and, by force or otherwise, to control the whole nation, is no sound argument in support of its constitutional *390 inability to preserve itself against a section of the nation acting in opposition to the general will.
It is true, that if all the States, or a majority of them, refuse to elect Senators, the legislative powers of the Union will be suspended. But if any one State shall refuse to elect them, the Senate will not, on that account, be the less capable of performing all its functions. The argument founded on this fact would seem rather to prove the subordination of the parts to the whole, than the complete independence of any one of them. The framers of the constitution were, indeed, unable to make any provisions which should protect that instrument against a general combination of the States, or of the people for its destruction, and, conscious of this inability they have not made the attempt. But they were able to provide against the operation of measures adopted in any one State, whose tendency might be to arrest the execution of the laws, and this it was the part of true wisdom to attempt. We think they have attempted it.
It has been also urged, as an additional objection to the jurisdiction of the Court, that cases between State and one of its own citizens, do not come with in the general scope of the constitution; and were obviously never intended to be made cognizable in the federal Courts. The State tribunals might be suspected of partiality in cases between itself or it citizens and aliens, or the citizens of another State but not in proceedings by a State against its own citizens. That jealousy which might exist in the first case, could not exist in the last, and therefor the judicial power is not extended to the last.
*391 This is very true, so far as jurisdiction depends on the character of the parties, and the argument would have great force if urged to prove that this Court could not establish the demand of a citizen upon his State, but is not entitled to the same force when urged to prove that this Court cannot inquire whether the constitution or laws of the United States protect a citizen from a prosecution instituted against him by a State. If jurisdiction depended entirely on the character of the parties, and was not given where the parties have not an original right to come into Court, that part of the 2d section of the 3d article, which extends the judicial power to all cases arising under the constitution and laws of the United States, would be mere surplusage. It is to give jurisdiction where the character of the parties would not give it, that this very important part of the clause was inserted. It may be true, that the partiality of the State tribunals, in ordinary controversies between a State and its citizens, was not apprehended, and therefore the judicial power of the Union was not extended to such cases, but this was not the sole nor the greatest object for which this department was created. A more important, a much more interesting object, was the preservation of the constitution and laws of the United States, so far as they can be preserved by judicial authority, and therefore the jurisdiction of the Courts of the Union was expressly extended to all cases arising under that constitution and those laws. If the constitution or laws may be violated by proceedings *392 instituted by a State against its own citizens, and if that violation may be such as essentially to affect the constitution and the laws, such as to arrest the progress of government in its constitutional course, why should these cases be excepted from that provision which expressly extends the judicial power of the Union to all cases arising under the constitution and laws?
After bestowing on this subject the most attentive consideration, the Court can perceive no reason founded on the character of the parties for introducing an exception which the constitution has not made, and we think that the judicial power, as originally given, extends to all cases arising under the constitution or a law of the United States, whoever may be the parties.
It has been also contended, that this jurisdiction, if given, is original, and cannot be exercised in the appellate form.
The words of the constitution are, "in all cases affecting ambassadors, other public ministers, and consuls, and those in which a State shall be a party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction."
This distinction between original and appellate jurisdiction, excludes, we are told, in all cases, the exercise of the one where the other is given.
The constitution gives the Supreme Court original jurisdiction in certain enumerated cases, and gives it appellate jurisdiction in all others. Among those in which jurisdiction must be exercised in the appellate *393 form, are cases arising under the constitution and laws of the United States. These provisions of the constitution are equally obligatory, and are to be equally respected. If a State be a party, the jurisdiction of this Court is original, if the case arise under a constitution or a law, the jurisdiction is appellate. But a case to which a State as a party may arise under the constitution or a law of the United States. What rule is applicable to such a case? What, then, becomes the duty of the Court? Certainly, we think, so to construe the constitution as to give effect to both provisions, as far as it is possible to reconcile them, and not to permit their seeming repugnancy to destroy each other. We must endeavour so to construe them as to preserve the true intent and meaning of the instrument.
In one description of cases, the jurisdiction of the Court is founded entirely on the character of the parties, and the nature of the controversy is not contemplated by the constitution. The character of the parties is every thing, the nature of the case nothing. In the other description of cases, the jurisdiction is founded entirely on the character of the case, and the parties are not contemplated by the constitution. In these, the nature of the case is every thing, the character of the parties nothing. When, then, the constitution declares the jurisdiction, in cases where a State shall be a party, to be original, and in all cases arising under the constitution or a law, to be appellate  the conclusion seems irresistible, that its framers designed to include in the first class *394 those cases in which jurisdiction is given, because a State is a party, and to include in the second, those in which jurisdiction is given, because the case arises under the constitution or a law.
This reasonable construction is rendered necessary by other considerations.
That the constitution or a law of the United States, is involved in a case, and makes a part of it, may appear in the progress of a cause, in which the Courts of the Union, but for that circumstance, would have no jurisdiction, and which of consequence could not originate in the Supreme Court. In such a case, the jurisdiction can be exercised only in its appellate form. To deny its exercise in this form is to deny its existence, and would be to construe a clause, dividing the power of the Supreme Court, in such manner, as in a considerable degree to defeat the power itself. All must perceive, that this construction can be justified only where it is absolutely necessary. We do not think the article under consideration presents that necessity.
It is observable, that in this distributive clause, no negative words are introduced. This observation is not made for the purpose of contending, that the legislature may "apportion the judicial power between the Supreme and inferior Courts according to its will." That would be, as was said by this Court in the case of Marbury v. Madison, to render the distributive clause "mere surplusage," to make it "form without substance." This cannot, therefore, be the true construction of the article.
*395 But although the absence of negative words will not authorize the legislature to disregard the distribution of the power previously granted, their absence will justify a sound construction of the whole article, so as to give every part its intended effect. It is admitted, that "affirmative words are often, in their operation, negative of other objects than those affirmed;" and that where "a negative or exclusive sense must be given to them, or they have no operation at all," they must receive that negative or exclusive sense. But where they have full operation without it, where it would destroy some of the most important objects for which the power was created; then, we think, affirmative words ought not to be construed negatively.
The constitution declares, that in cases where a State is a party, the Supreme Court shall have original jurisdiction, but does not say that its appellate jurisdiction shall not be exercised in cases where, from their nature, appellate jurisdiction is given, whether a State be or be not a party. It may be conceded, that where the case is of such a nature as to admit of its originating in the Supreme Court, it ought to originate there; but where, from its nature, it cannot originate in that Court, these words ought not to be so construed as to require it. There are many cases in which it would be found extremely difficult, and subversive of the spirit of the constitution, to maintain the construction, that appellate jurisdiction cannot be exercised where one of the parties might sue or be sued in this Court.
The constitution defines the jurisdiction of the *396 Supreme Court, but does not define that of the inferior Courts. Can it be affirmed, that a State might not sue the citizen of another State in a Circuit Court? Should the Circuit Court decide for or against its jurisdiction, should it dismiss the suit, or give judgment against the State, might not its decision be revised in the Supreme Court? The argument is, that it could not, and the very clause which is urged to prove, that the Circuit Court could give no judgment in the case, is also urged to prove, that its judgment is irreversible. A supervising Court, whose peculiar province it is to correct the errors of an inferior Court, has no power to correct a judgment given without jurisdiction, because, in the same case, that supervising Court has original jurisdiction. Had negative words been employed, it would be difficult to give them this construction if they would admit of any other. But, without negative words, this irrational construction can never be maintained.
So, too, in the same clause, the jurisdiction of the Court is declared to be original, "in cases affecting ambassadors, other public ministers, and consuls." There is, perhaps, no part of the article under consideration so much required by national policy as this; unless it be that part which extends the judicial power "to all cases arising under the constitution, laws, and treaties of the United States." It has been generally held, that the State Courts have a concurrent jurisdiction with the federal Courts, in cases to which the judicial power is extended, unless the jurisdiction of the federal Courts be rendered exclusive *397 by the words of the third article. If the words, "to all cases," give exclusive jurisdiction in cases affecting foreign ministers, they may also give exclusive jurisdiction, if such be the will of Congress, in cases arising under the constitution, laws, and treaties of the United States. Now, suppose an individual were to sue a foreign minister in a State Court, and that Court were to maintain its jurisdiction, and render judgment against the minister, could it be contended, that this Court would be incapable of revising such judgment, because the constitution had given it original jurisdiction in the case? If this could be maintained, then a clause inserted for the purpose of excluding the jurisdiction of all other Courts than this, in a particular case, would have the effect of excluding the jurisdiction of this Court in that very case, if the suit were to be brought in another Court, and that Court were to assert jurisdiction. This tribunal, according to the argument which has been urged, could neither revise the judgment of such other Court, nor suspend its proceedings for a writ of prohibition, or any other similar writ, is in the nature of appellate process.
Foreign consuls frequently assert, in our Prize Courts, the claims of their fellow subjects. These suits are maintained by them as consuls. The appellate power of this Court has been frequently exercised in such cases, and has never been questioned. It would be extremely mischievous to withhold its exercise. Yet the consul is a party on the record. The truth is, that where the words confer only appellate jurisdiction, original jurisdiction is most *398 clearly not given; but where the words admit of appellate jurisdiction, the power to take cognizance of the suit originally, does not necessarily negative the power to decide upon it on an appeal, if it may originate in a different Court.
It is, we think, apparent, that to give this distributive clause the interpretation contended for, to give to its affirmative words a negative operation, in every possible case, would, in some instances, defeat the obvious intention of the article. Such an interpretation would not consist with those rules which, from time immemorial, have guided Courts, in their construction of instruments brought under their consideration. It must, therefore, be discarded. Every part of the article must be taken into view, and that construction adopted which will consist with its words, and promote its general intention. The Court may imply a negative from affirmative words, where the implication promotes, not where it defeats the intention.
If we apply this principle, the correctness of which we believe will not be controverted, to the distributive clause under consideration, the result, we think, would be this: the original jurisdiction of the Supreme Court, in cases where a State is a party, refers to those cases in which, according to the grant of power made in the preceding clause, jurisdiction might be exercised in consequence of the character of the party, and an original suit might be instituted in any of the federal Courts; not to those cases in which an original suit might not be *399 instituted in a federal Court. Of the last description, is every case between a State and its citizens, and, perhaps, every case in which a State is enforcing its penal laws. In such cases, therefore, the Supreme Court cannot take original jurisdiction. In every other case, that is, in every case to which the judicial power extends, and in which original jurisdiction is not expressly given, that judicial power shall be exercised in the appellate, and only in the appellate form. The original jurisdiction of this Court cannot be enlarged, but its appellate jurisdiction may be exercised in every case cognizable under the third article of the constitution, in the federal Courts, in which original jurisdiction cannot be exercised, and the extent of this judicial power is to be measured, not by giving the affirmative words of the distributive clause a negative operation in every possible case, but by giving their true meaning to the words which define its extent.
The counsel for the defendant in error urge, in opposition to this rule of construction, some dicta of the Court, in the case of Marbury v. Madison.
It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered *400 in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.
In the case of Marbury v. Madison, the single question before the Court, so far as that case can be applied to this, was, whether the legislature could give this Court original jurisdiction in a case in which the constitution had clearly not given it, and in which no doubt respecting the construction of the article could possibly be raised. The Court decided and we think very properly, that the legislature could not give original jurisdiction in such a case. But, in the reasoning of the Court in support of this decision, some expressions are used which go far beyond it. The counsel for Marbury had insisted on the unlimited discretion of the legislature in the apportionment of the judicial power, and it is against this argument that the reasoning of the Court is directed. They say that, if such had been the intention of the article, "it would certainly have been useless to proceed farther than to define the judicial power, and the tribunals in which it should be vested." The Court says, that such a construction would render the clause, dividing the jurisdiction of the Court into original and appellate, totally useless, that "affirmative words are often, in their operation, negative of other objects than those which are affirmed, and, in this case, (in the case of Marbury v. Madison,) a negative or exclusive sense must be given to them, or they have no operation at all." "It cannot be presumed," adds the Court, "that any clause in the constitution is intended to be without *401 effect, and, therefore, such a construction is inadmissible, unless the words require it."
The whole reasoning of the Court proceeds upon the idea that the affirmative words of the clause giving one sort of jurisdiction, must imply a negative of any other sort of jurisdiction, because otherwise the words would be totally inoperative, and this reasoning is advanced in a case to which it was strictly applicable. If in that case original jurisdiction could have been exercised, the clause under consideration would have been entirely useless. Having such cases only in its view, the Court lays down a principle which is generally correct, in terms much broader than the decision, and not only much broader than the reasoning with which that decision is supported, but in some instances contradictory to its principle. The reasoning sustains the negative operation of the words in that case, because otherwise the clause would have no meaning whatever, and because such operation was necessary to give effect to the intention of the article. The effort now made is, to apply the conclusion to which the Court was conducted by that reasoning in the particular case, to one in which the words have their full operation when understood affirmatively, and in which the negative, or exclusive sense, is to be so used as to defeat some of the great objects of the article.
To this construction the Court cannot give its assent. The general expressions in the case of Marbury v. Madison must be understood with the limitations which are given to them in this opinion, limitations *402 which in no degree affect the decision in that case, or the tenor of its reasoning.
The counsel who closed the argument, put several cases for the purpose of illustration, which he supposed to arise under the constitution, and yet to be, apparently, without the jurisdiction or the Court.
Were a State to lay a duty on exports, to collect the money and place it in her treasury, could the citizen who paid it, he asks, maintain a suit in this Court against such State, to recover back the money?
Perhaps not. Without, however, deciding such supposed case, we may say, that it is entirely unlike that under consideration.
The citizen who has paid his money to his State, under a law that is void, is in the same situation with every other person who has paid money by mistake. The law raises an assumpsit to return the money, and it is upon that assumpsit that the action is to be maintained. To refuse to comply with this assumpsit may be no more a violation of the constitution, than to refuse to comply with any other, and as the federal Courts never had jurisdiction over contracts between a State and its citizens, they may have none over this. But let us so vary the supposed case, as to give it a real resemblance to that under consideration. Suppose a citizen to refuse to pay this export duty, and a suit to be instituted for the purpose of compelling him to pay it. He pleads the constitution of the United States in bar of the action, notwithstanding which the Court gives judgment against him. This would be a case arising under *403 the constitution, and would be the very case now before the Court.
We are also asked, if a State should confiscate property secured by a treaty, whether the individual could maintain an action for that property?
If the property confiscated be debts, our own experience informs us that the remedy of the creditor against his debtor remains. If it be land, which is secured by a treaty, and afterwards confiscated by a State, the argument does not assume that this title, thus secured, could be extinguished by an act of confiscation. The injured party, therefore, has his remedy against the occupant of the land for that which the treaty secures to him, not against the State for money which is not secured to him.
The case of a State which pays off its own debts with paper money, no more resembles this than do those to which we have already adverted. The Courts have no jurisdiction over the contract. They cannot enforce it, nor judge of its violation. Let it be that the act discharging the debt is a mere nullity and that it is still due. Yet the federal Courts have no cognizance of the case. But suppose a State to institute proceedings against an individual, which depended on the validity of an act emitting bills of credit suppose a State to prosecute one of its citizens for refusing paper money, who should plead the constitution in bar of such prosecution. If his plea should be overruled, and judgment rendered against him, his case would resemble this; and, unless the jurisdiction of this Court might be exercised over it, the constitution would *404 be violated, and the injured party be unable to bring his case before that tribunal to which the people of the United States have assigned all such cases.
It is most true that this Court will not take jurisdiction if it should not but it is equally true, that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty. In doing this, on the present occasion, we find this tribunal invested with appellate jurisdiction in all cases arising under the constitution and laws of the United States. We find no exception to this grant, and we cannot insert one.
To escape the operation of these comprehensive words, the counsel for the defendant has mentioned instances in which the constitution might be violated without giving jurisdiction to this Court. These words, therefore, however universal in their expression, must, he contends, be limited and controlled in their construction by circumstances. One of these instances is, the grant by a State of a patent of nobility. The Court, he says, cannot annul this grant.
*405 This may be very true, but by no means justifies the inference drawn from it. The article does not extend the judicial power to every violation of the constitution which may possibly take place, but to "a case in law or equity," in which a right, under such law, is asserted in a Court of justice. If the question cannot be brought into a Court, then there is no case in law or equity, and no jurisdiction is given by the words of the article. But if, in any controversy depending in a Court, the cause should depend on the validity of such a law, that would be a case arising under the constitution, to which the judicial power of the United States would extend. The same observation applies to the other instances with which the counsel who opened the cause has illustrated this argument. Although they show that there may be violations of the constitution, of which the Courts can take no cognizance, they do not show that an interpretation more restrictive than the words themselves import ought to be given to this article. They do not show that there can be "a case in law or equity," arising under the constitution, to which the judicial power does not extend.
We think, then, that, as the constitution originally stood, the appellate jurisdiction of this Court, in all cases arising under the constitution, laws, or treaties of the United States, was not arrested by the circumstance that a State was a party.
This leads to a consideration of the 11th amendment.
It is in these words. "The judicial power of the United States shall not be construed to extend to any *406 suit in law or equity commenced or prosecuted against one of the United States, by citizens of another State, or by citizens or subjects of any foreign State."
It is a part of our history, that, at the adoption of the constitution, all the States were greatly indebted; and the apprehension that these debts might be prosecuted in the federal Courts, formed a very serious objection to that instrument. Suits were instituted; and the Court maintained its jurisdiction. The alarm was general; and, to quiet the apprehensions that were so extensively entertained, this amendment was proposed in Congress, and adopted by the State legislatures. That its motive was not to maintain the sovereignty of a State from the degradation supposed to attend a compulsory appearance before the tribunal of the nation, may be inferred from the terms of the amendment. It does not comprehend controversies between two or more States, or between a State and a foreign State. The jurisdiction of the Court still extends to these cases and in these a State may still be sued. We must ascribe the amendment, then, to some other cause than the dignity of a State. There is no difficulty in finding this cause. Those who were inhibited from commencing a suit against a State, or from prosecuting one which might be commenced before the adoption of the amendment, were persons who might probably be its creditors. There was not much reason to fear that foreign or sister States would be creditors to any considerable amount, and there was reason to retain the jurisdiction of the Court in those *407 cases, because it might be essential to the preservation of peace. The amendment, therefore, extended to suits commenced or prosecuted by individuals, but not to those brought by States.
The first impression made on the mind by this amendment is, that it was intended for those cases, and for those only, in which some demand against a State is made by an individual in the Courts of the Union. If we consider the causes to which it is to be traced, we are conducted to the same conclusion. A general interest might well be felt in leaving to a State the full power of consulting its convenience in the adjustment of its debts, or of other claims upon it, but no interest could be felt in so changing the relations between the whole and its parts, as to strip the government of the means of protecting, by the instrumentality of its Courts, the constitution and laws from active violation.
The words of the amendment appear to the Court to justify and require this construction. The judicial power is not "to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another State, &c."
What is a suit? We understand it to be the prosecution, or pursuit, of some claim, demand, or request. In law language, it is the prosecution of some demand in a Court of justice. The remedy for every species of wrong is says Judge Blackstone, "the being put in possession of that right whereof the party injured is deprived." "The instruments whereby this remedy is obtained, are a diversity of suits and actions, which are defined by the *408 Mirror to be `the lawful demand of one's right.' Or, as Bracton and Fleta express it, in the words of Justinian, `jus prosequendi in judicio quod alicui debetur." Blackstone then proceeds to describe every species of remedy by suit; and they are all cases were the party suing claims to obtain something to which he has a right.
To commence a suit, is to demand something by the institution of process in a Court of justice, and to prosecute the suit, is, according to the common acceptation of language, to continue that demand. By a suit commenced by an individual against a State, we should understand process sued out by that individual against the State, for the purpose of establishing some claim against it by the judgment of a Court; and the prosecution of that suit is its continuance. Whatever may be the stages of its progress, the actor is still the same. Suits had been commenced in the Supreme Court against some of the States before this amendment was introduced into Congress, and others might be commenced before it should be adopted by the State legislatures, and might be depending at the time of its adoption. The object of the amendment was not only to prevent the commencement of future suits, but to arrest the prosecution of those which might be commenced when this article should form a part of the constitution. It therefore embraces both objects; and its meaning is, that the judicial power shall not be construed to extend to any suit which may be commenced, or which, if already commenced, may be *409 prosecuted against a State by the citizen of another State. If a suit, brought in one Court, and carried by legal process to a supervising Court, be a continuation of the same suit, then this suit is not commenced nor prosecuted against a State. It is clearly in its commencement the suit of a State against an individual, which suit is transferred to this Court, not for the purpose of asserting any claim against the State, but for the purpose of asserting a constitutional defence against a claim made by a State.
A writ of error is defined to be, a commission by which the judges of one Court are authorized to examine a record upon which a judgment was given in another Court, and, on such examination, to affirm or reverse the same according to law. If, says my Lord Coke, by the writ of error, the plaintiff may recover, or be restored to any thing, it may be released by the name of an action. In Bacon's Abridgment, tit. Error, L. it is laid down, that "where by a writ of error, the plaintiff shall recover, or be restored to any personal thing, as debt, damage, or the like, a release of all actions personal is a good plea, and when land is to be recovered or restored in a writ of error, a release of actions real is a good bar, but where by a writ of error the plaintiff shall not be restored to any personal or real thing, a release of all actions, real or personal, is no bar." And for this we have the authority of Lord Coke, both in his Commentary on Littleton and in his Reports. A writ of error, then, is in the nature of a suit or action when it is to restore the party who obtains it to the possession of anything which is withheld *410 from him, not when its operation is entirely defensive.
This rule will apply to writs of error from the Courts of the United States, as well as to those writs in England.
Under the judiciary act, the effect of a writ of error is simply to bring the record into Court, and submit the judgment of the inferior tribunal to re-examination. It does not in any manner act upon the parties, it acts only on the record. It removes the record into the supervising tribunal. Where, then, a State obtains a judgment against an individual, and the Court, rendering such judgment, overrules a defence set up under the constitution or laws of the United States, the transfer of this record into the Supreme Court, for the sole purpose of inquiring whether the judgment violates the constitution or laws of the United States, can, with no propriety, we think, be denominated a suit commenced or prosecuted against the State whose judgment is so far re-examined. Nothing is demanded from the State. No claim against it of any description is asserted or prosecuted. The party is not to be restored to the possession of any thing. Essentially, it is an appeal on a single point; and the defendant who appeals from a judgment rendered against him, is never said to commence or prosecute a suit against the plaintiff who has obtained the judgment. The writ of error is given rather than an appeal, because it is the more usual mode of removing suits at common law; and because, perhaps, it is more technically proper where a single point of law, and not the whole case, is to *411 be re-examined. But an appeal might be given, and might be so regulated as to effect every purpose of a writ of error. The mode of removal is form, and not substance. Whether it be by writ of error or appeal, no claim is asserted, no demand is made by the original defendant, he only asserts the constitutional right to have his defence examined by that tribunal whose province it is to construe the constitution and laws of the Union.
The only part of the proceeding which is in any manner personal, is the citation. And what is the citation? It is simply notice to the opposite party that the record is transferred into another Court, where he may appear, or decline to appear, as his judgment or inclination may determine. As the party who has obtained a judgment as out of Court, and may, therefore, not know that his cause is removed, common justice requires that notice of the fact should be given him. But this notice is not a suit, nor has it the effect of process. If the party does not choose to appear, he cannot be brought into Court, nor is his failure to appear considered as a default. Judgment cannot be given against him for his non-appearance, but the judgment is to be re-examined, and reversed or affirmed, in like manner as if the party had appeared and argued his cause.
The point of view in which this writ of error, with its citation, has been considered uniformly in the Courts of the Union, has been well illustrated by a reference to the course of this Court in suits instituted by the United States. The universally received opinion is, that no suit can be commenced *412 or prosecuted against the United States; that the judiciary act does not authorize such suits. Yet writs of error, accompanied with citations, have uniformly issued for the removal of judgments in favour of the United States into a superior Court, where they have, like those in favour of an individual, been re-examined, and affirmed or reversed. It has never been suggested, that such writ of error was a suit against the United States, and, therefore, not within the jurisdiction of the appellate Court.
It is, then, the opinion of the Court, that the defendant who removes a judgment rendered against him by a State Court into this Court, for the purpose of re-examining the question, whether that judgment be in violation of the constitution or laws of the United States, does not commence or prosecute a suit against the State, whatever may be its opinion where the effect of the writ may be to restore the party to the possession of a thing which he demands.
But should we in this be mistaken, the error does not affect the case now before the Court. If this writ of error be a suit in the sense of the 11th amendment, it is not a suit commenced or prosecuted "by a citizen of another State, or by a citizen or subject of any foreign State." It is not then within the amendment, but is governed entirely by the constitution as originally framed, and we have already seen, that in its origin, the judicial power was extended to all cases arising under the constitution or laws of the United States, without respect to parties.
*413 2d. The second objection to the jurisdiction of the Court is, that its appellate power cannot be exercised, in any case, over the judgment of a State Court.
This objection is sustained chiefly by arguments drawn from the supposed total separation of the judiciary of a State from that of the Union, and their entire independence of each other. The argument considers the federal judiciary as completely foreign to that of a State, and as being no more connected with it in any respect whatever, than the Court of a foreign State. If this hypothesis be just, the argument founded on it is equally so, but if the hypothesis be not supported by the constitution, the argument fails with it.
This hypothesis is not founded on any words in the constitution, which might seem to countenance it, but on the unreasonableness of giving a contrary construction to words which seem to require it, and on the incompatibility of the application of the appellate jurisdiction to the judgments of State Courts, with that constitutional relation which subsists between the government of the Union and the governments of those States which compose it.
Let this unreasonableness, this total incompatibility, be examined.
That the United States form, for many, and for most important purposes, a single nation, has not yet been denied. In war, we are one people. In making peace, we are one people. In all commercial regulations, we are one and the same people. In *414 many other respects, the American people are one, and the government which is alone capable of controling and managing their interests in all these respects, is the government of the Union. It is their government, and in that character they have no other. America has chosen to be, in many respects, and to many purposes, a nation, and for all these purposes, her government is complete; to all these objects, it is competent. The people have declared, that in the exercise of all powers given for these objects, it is supreme. It can, then, in effecting these objects, legitimately control all individuals or governments within the American territory. The constitution and laws of a State, so far as they are repugnant to the constitution and laws of the United States, are absolutely void. These States are constituent parts of the United States. They are members of one great empire  for some purposes sovereign, for some purposes subordinate.
In a government so constituted, is it unreasonable that the judicial power should be competent to give efficacy to the constitutional laws of the legislature? That department can decide on the validity of the constitution or law of a State, if it be repugnant to the constitution or to a law of the United States. Is it unreasonable that it should also be empowered to decide on the judgment of a State tribunal enforcing such unconstitutional law? Is it so very unreasonable as to furnish a justification for controling the words of the constitution?
We think it is not. We think that in a government *415 acknowledgedly supreme, with respect to objects of vital interest to the nation, there is nothing inconsistent with sound reason, nothing incompatible with the nature of government, in making all its departments supreme, so far as respects those objects, and so far as is necessary to their attainment. The exercise of the appellate power over those judgments of the State tribunals which may contravene the constitution or laws of the United States, is, we believe, essential to the attainment of those objects.
The propriety of entrusting the construction of the constitution, and laws made in pursuance thereof, to the judiciary of the Union, has not, we believe, as yet, been drawn into question. It seems to be a corollary from this political axiom, that the federal Courts should either possess exclusive jurisdiction in such cases, or a power to revise the judgment rendered in them, by the State tribunals. If the federal and State Courts have concurrent jurisdiction in all cases arising under the constitution, laws, and treaties of the United States, and if a case of this description brought in a State Court cannot be removed before judgment, nor revised after judgment, then the construction of the constitution, laws, and treaties of the United States, is not confided particularly to their judicial department, but is confided equally to that department and to the State Courts, however they may be constituted. "Thirteen independent Courts," says a very celebrated statesman, (and we have now more than twenty such Courts,) "of final jurisdiction over the same causes, arising upon the same laws, is a hydra in government, from *416 which nothing but contradiction and confusion can proceed."
Dismissing the unpleasant suggestion, that any motives which may not be fairly avowed, or which ought not to exist, can ever influence a State or its Courts, the necessity of uniformity, as well as correctness in expounding the constitution and laws of the United States, would itself suggest the propriety of vesting in some single tribunal the power of deciding, in the last resort, all cases in which they are involved.
We are not restrained, then, by the political relations between the general and State governments, from construing the words of the constitution, defining the judicial power, in their true sense. We are not bound to construe them more restrictively than they naturally import.
They give to the Supreme Court appellate jurisdiction in all cases arising under the constitution, laws, and treaties of the United States. The words are broad enough to comprehend all cases of this description, in whatever Court they may be decided. In expounding them, we may be permitted to take into view those considerations to which Courts have always allowed great weight in the exposition of laws.
The framers of the constitution would naturally examine the state of things existing at the time, and their work sufficiently attests that they did so. All acknowledge that they were convened for the purpose of strengthening the confederation by enlarging the powers of the government, and by giving efficacy *417 to those which it before possessed, but could not exercise. They inform us themselves, in the instrument they presented to the American public, that one of its objects was to form a more perfect union. Under such circumstances, we certainly should not expect to find, in that instrument, a diminution of the powers of the actual government.
Previous to the adoption of the confederation, Congress established Courts which received appeals in prize causes decided in the Courts of the respective States. This power of the government, to establish tribunals for these appeals, was thought consistent with, and was founded on, its political relations with the States. These Courts did exercise appellate jurisdiction over those cases decided in the State Courts, to which the judicial power of the federal government extended.
The confederation gave to Congress the power "of establishing Courts for receiving and determining finally appeals in all cases of captures."
This power was uniformly construed to authorize those Courts to receive appeals from the sentences of State Courts, and to affirm or reverse them. State tribunals are not mentioned, but this clause in the confederation necessarily comprises them. Yet the relation between the general and State governments was much weaker, much more lax, under the confederation than under the present constitution; and the States being much more completely sovereign, their institutions were much more independent.
The Convention which framed the constitution, on *418 turning their attention to the judicial power, found it limited to a few objects, but exercised, with respect to some of those objects, in its appellate form, over the judgments of the State Courts. They extend it, among other objects, to all cases arising under the constitution, laws, and treaties of the United States, and in a subsequent clause declare, that in such cases, the Supreme Court shall exercise appellate jurisdiction. Nothing seems to be given which would justify the withdrawal of a judgment rendered in a State Court, on the constitution, laws, or treaties of the United States, from this appellate jurisdiction.
Great weight has always been attached, and very rightly attached, to contemporaneous exposition. No question, it is believed, has arisen to which this principle applies more unequivocally than to that now under consideration.
The opinion of the Federalist has always been considered as of great authority. It is a complete commentary on our constitution; and is appealed to by all parties in the questions to which that instrument has given birth. Its intrinsic merit entitles it to this high rank, and the part two of its authors performed in framing the constitution, put it very much in their power to explain the views with which it was framed. These essays having been published while the constitution was before the nation for adoption or rejection, and having been written in answer to objections founded entirely on the extent of its powers, and on its diminution of State sovereignty, are entitled to the more consideration where they *419 frankly avow that the power objected to is given, and defend it.
In discussing the extent of the judicial power, the Federalist says, "Here another question occurs: what relation would subsist between the national and State Courts in these instances of concurrent jurisdiction? I answer, that an appeal would certainly lie from the latter, to the Supreme Court of the United States. The constitution in direct terms gives an appellate jurisdiction to the Supreme Court in all the enumerated cases of federal cognizance in which it is not to have an original one, without a single expression to confine its operation to the inferior federal Courts. The objects of appeal, not the tribunals from which it is to be made, are alone contemplated. From this circumstance, and from the reason of the thing, it ought to be construed to extend to the State tribunals. Either this must be the case, or the local Courts must be excluded from a concurrent jurisdiction in matters of national concern, else the judicial authority of the Union may be eluded at the pleasure of every plaintiff or prosecutor. Neither of these consequences ought, without evident necessity, to be involved, the latter would be entirely inadmissible, as it would defeat some of the most important and avowed purposes of the proposed government, and would essentially embarrass its measures. Nor do I perceive any foundation for such a supposition. Agreeably to the remark already made, the national and State systems are to be regarded as ONE WHOLE. The Courts of the latter will of course be natural auxiliaries to the execution *420 of the laws of the Union, and an appeal from them will as naturally lie to that tribunal which is destined to unite and assimilate the principles of natural justice, and the rules of national decision. The evident aim of the plan of the national convention is, that all the causes of the specified classes shall, for weighty public reasons, receive their original or final determination in the Courts of the Union. To confine, therefore, the general expressions which give appellate jurisdiction to the Supreme Court, to appeals from the subordinate federal Courts, instead of allowing their extension to the State Courts, would be to abridge the latitude of the terms, in subversion of the intent, contrary to every sound rule of interpretation."
A contemporaneous exposition of the constitution, certainly of not less authority than that which has been just cited, is the judiciary act itself. We know that in the Congress which passed that act were many eminent members of the Convention which formed the constitution. Not a single individual, so far as is known, supposed that part of the act which gives the Supreme Court appellate jurisdiction over the judgments of the State Courts in the cases therein specified, to be unauthorized by the constitution.
While on this part of the argument, it may be also material to observe that the uniform decisions of this Court on the point now under consideration, have been assented to, with a single exception, by the Courts of every State in the Union whose judgments have been revised. It has been the unwelcome *421 duty of this tribunal to reverse the judgments of many State Courts in cases in which the strongest State feelings were engaged. Judges, whose talents and character would grace any bench, to whom a disposition to submit to jurisdiction that is usurped, or to surrender their legitimate powers, will certainly not be imputed, have yielded without hesitation to the authority by which their judgments were reversed, while they, perhaps, disapproved the judgment of reversal.
This concurrence of statesmen, of legislators, and of judges, in the same construction of the constitution, may justly inspire some confidence in that construction.
In opposition to it, the counsel who made this point has presented in a great variety of forms, the idea already noticed, that the federal and State Courts must, of necessity, and from the nature of the constitution, be in all things totally distinct and independent of each other. If this Court can correct the errors of the Courts of Virginia, he says it makes them Courts of the United States, or becomes itself a part of the judiciary of Virginia.
But, it has been already shown that neither of these consequences necessarily follows. The American people may certainly give to a national tribunal a supervising power over those judgments of the State Courts, which may conflict with the constitution, laws, or treaties, of the United States, without converting them into federal Courts, or converting the national into a State tribunal. The one Court *422 still derives its authority from the State, the other still derives its authority from the nation.
If it shall be established, he says, that this Court has appellate jurisdiction over the State Courts in all cases enumerated in the 3d article of the constitution, a complete consolidation of the States, so far as respects judicial power is produced.
But, certainly, the mind of the gentleman who urged this argument is too accurate not to perceive that he has carried it too far, that the premises by no means justify the conclusion. "A complete consolidation of the States, so far as respects the judicial power," would authorize the legislature to confer on the federal Courts appellate jurisdiction from the State Courts in all cases whatsoever. The distinction between such a power, and that of giving appellate jurisdiction in a few specified cases in the decision of which the nation takes an interest, is too obvious not to be perceived by all.
This opinion has been already drawn out to too great a length to admit of entering into a particular consideration of the various forms in which the counsel who made this point has, with much ingenuity, presented his argument to the Court. The argument in all its forms is essentially the same. It is founded, not on the words of the constitution, but on its spirit, a spirit extracted, not from the words of the instrument, but from his view of the nature of our Union, and of the great fundamental principles on which the fabric stands.
To this argument, in all its forms, the same answer may be given. Let the nature and objects of *423 our Union be considered; let the great fundamental principles, on which the fabric stands, be examined, and we think the result must be, that there is nothing so extravagantly absurd in giving to the Court of the nation the power of revising the decisions of local tribunals on questions which affect the nation, as to require that words which import this power should be restricted by a forced construction. The question then must depend on the words themselves and on their construction we shall be the more readily excused for not adding to the observations already made, because the subject was fully discussed and exhausted in the case of Martin v. Hunter.
3d. We come now to the third objection, which, though differently stated by the counsel, is substantially the same. One gentleman has said that the judiciary act does not give jurisdiction in the case.
The cause was argued in the State Court, on a case agreed by the parties, which states the prosecution under a law for selling lottery tickets, which is set forth, and further states the act of Congress by which the City of Washington was authorized to establish the lottery. It then states that the lottery was regularly established by virtue of the act, and concludes with referring to the Court the questions, whether the act of Congress be valid? whether, on its just construction, it constitutes a bar to the prosecution? and, whether the act of Assembly, on which the prosecution is founded, be not itself invalid? These questions were decided against the operation of the act of Congress, and in favour of the operation of the act of the State.
*424 If the 25th section of the judiciary act be inspected, it will at once be perceived that it comprehends expressly the case under consideration.
But it is not upon the letter of the act that the gentleman who stated this point in this form, founds his argument. Both gentlemen concur substantially in their views of this part of the case. They deny that the act of Congress, on which the plaintiff in error relies, is a law of the United States, or, if a law of the United States, is within the second clause of the sixth article.
In the enumeration of the powers of Congress, which is made in the 8th section of the first article, we find that of exercising exclusive legislation over such District as shall become the seat of government. This power, like all others which are specified, is conferred on Congress as the legislature of the Union for, strip them of that character, and they would not possess it. In no other character can it be exercised. In legislating for the District, they necessarily preserve the character of the legislature of the Union, for, it is in that character alone that the constitution confers on them this power of exclusive legislation. This proposition need not be enforced.
The 2d clause of the 6th article declares, that "This constitution, and the laws of the United States, which shall be made in pursuance thereof, shall be the supreme law of the land."
The clause which gives exclusive jurisdiction is, unquestionably, a part of the constitution, and, as such, binds all the United States. Those who contend that acts of Congress, made in pursuance of *425 this power, do not, like acts made in pursuance of other powers, bind the nation, ought to show some safe and clear rule which shall support this construction, and prove that an act of Congress, clothed in all the forms which attend other legislative acts, and passed in virtue of a power conferred on, and exercised by Congress, as the legislature of the Union, is not a law of the United States, and does not bind them.
One of the gentlemen sought to illustrate his proposition that Congress, when legislating for the District, assumed a distinct character, and was reduced to a mere local legislature, whose laws could possess no obligation out of the ten miles square, by a reference to the complex character of this Court. It is, they say, a Court of common law and a Court of equity. Its character, when sitting as a Court of common law, is as distinct from its character when sitting as a Court of equity, as if the powers belonging to those departments were vested in different tribunals. Though united in the same tribunal, they are never confounded with each other.
Without inquiring how far the union of different characters in one Court, may be applicable, in principle, to the union in Congress of the power of exclusive legislation in some places, and of limited legislation in others, it may be observed, that the forms of proceedings in a Court of law are so totally unlike the forms of proceedings in a Court of equity, that a mere inspection of the record gives decisive information of the character in which the Court sits, and consequently of the extent of its powers. But *426 if the forms of proceeding were precisely the same, and the Court the same, the distinction would disappear.
Since Congress legislates in the same forms, and in the same character, in virtue of powers of equal obligation, conferred in the same instrument, when exercising its exclusive powers of legislation, as well as when exercising those which are limited, we must inquire whether there be any thing in the nature of this exclusive legislation, which necessarily confines the operation of the laws made in virtue of this power to the place with a view to which they are made.
Connected with the power to legislate within this District, is a similar power in forts, arsenals, dock yards, &c. Congress has a right to punish murder in a fort, or other place within its exclusive jurisdiction; but no general right to punish murder committed within any of the States. In the act for the punishment of crimes against the United States, murder committed within a fort, or any other place or district of country, under the sole and exclusive jurisdiction of the United States, is punished with death. Thus Congress legislates in the same act, under its exclusive and its limited powers.
The act proceeds to direct, that the body of the criminal, after execution, may be delivered to a surgeon for dissection, and punishes any person who shall rescue such body during its conveyance from the place of execution to the surgeon to whom it is to be delivered.
*427 Let these actual provisions of the law, or any other provisions which can be made on the subject, be considered with a view to the character in which Congress acts when exercising its powers of exclusive legislation.
If Congress is to be considered merely as a local legislature, invested, as to this object, with powers limited to the fort, or other place, in which the murder may be committed, if its general powers cannot come in aid of these local powers, how can the offence be tried in any other Court than that of the place in which it has been committed? How can the offender be conveyed to, or tried in, any other place? How can he be executed elsewhere? How can his body be conveyed through a country under the jurisdiction of another sovereign, and the individual punished, who, within that jurisdiction, shall rescue the body.
Were any one State of the Union to pass a law for trying a criminal in a Court not created by itself, in a place not within its jurisdiction, and direct the sentence to be executed without its territory, we should all perceive and acknowledge its incompetency to such a course of legislation. If Congress be not equally incompetent, it is because that body unites the powers of local legislation with those which are to operate through the Union, and may use the last in aid of the first, or because the power of exercising exclusive legislation draws after it, as an incident, the power of making that legislation effectual, and the incidental power may be exercised *428 throughout the Union, because the principal power is given to that body as the legislature of the Union.
So, in the same act, a person who, having knowledge of the commission of murder, or other felony, on the high seas, or within any fort, arsenal, dock yard, magazine, or other place, or district of country within the sole and exclusive jurisdiction of the United States, shall conceal the same, &c. he shall be adjudged guilty of misprision of felony, and shall be adjudged to be imprisoned, &c.
It is clear, that Congress cannot punish felonies generally, and, of consequence, cannot punish misprision of felony. It is equally clear, that a State legislature, the State of Maryland for example, cannot punish those who, in another State, conceal a felony committed in Maryland. How, then, is it that Congress, legislating exclusively for a fort, punishes those who, out of that fort, conceal a felony committed within it?
The solution, and the only solution of the difficulty, is, that the power vested in Congress, as the legislature of the United States, to legislate exclusively within any place ceded by a State, carries with it, as an incident, the right to make that power effectual. If a felon escape out of the State in which the act has been committed, the government cannot pursue him into another State, and apprehend him there, but must demand him from the executive power of that other State. If Congress were to be considered merely as the local legislature for the fort or other place in which the offence might be committed, then this principle would apply to them as to other local *429 legislatures, and the felon who should escape out of the fort, or other place, in which the felony may have been committed, could not be apprehended by the marshal, but must be demanded from the executive of the State. But we know that the principle does not apply, and the reason is, that Congress is not a local legislature, but exercises this particular power, like all its other powers, in its high character, as the legislature of the Union. The American people thought it a necessary power, and they conferred it for their own benefit. Being so conferred, it carries with it all those incidental powers which are necessary to its complete and effectual execution.
Whether any particular law be designed to operate without the District or not, depends on the words of that law. If it be designed so to operate, then the question, whether the power so exercised be incidental to the power of exclusive legislation, and be warranted by the constitution, requires a consideration of that instrument. In such cases the constitution and the law must be compared and construed. This is the exercise of jurisdiction. It is the only exercise of it which is allowed in such a case. For the act of Congress directs, that "no other error shall be assigned or regarded as a ground of reversal, in any such case as aforesaid, than such as appears on the face of the record, and immediately respects the before mentioned questions of validity or construction of the said constitution, treaties," &c.
The whole merits of this case, then, consist in the construction of the constitution and the act of Congress. *430 The jurisdiction of the Court, if acknowledged, goes no farther. This we are required to do without the exercise of jurisdiction.
The counsel for the State of Virginia have, in support of this motion, urged many arguments of great weight against the application of the act of Congress to such a case as this; but those arguments go to the construction of the constitution, or of the law, or of both, and seem, therefore, rather calculated to sustain their cause upon its merits, than to prove a failure of jurisdiction in the Court.
After having bestowed upon this question the most deliberate consideration of which we are capable, the Court is unanimously of opinion, that the objections to its jurisdiction are not sustained, and that the motion ought to be overruled.
Motion denied.
The cause was this day argued on the merits.
*440 The opinion of the Court was delivered by Mr. Chief Justice MARSHALL.
This case was stated in the opinion given on the motion for dismissing the writ of error for want of jurisdiction in the Court. It now comes on to be decided on the question whether the Borough Court of Norfolk, in overruling the defence set up under *441 the act of Congress, has misconstrued that act. It is in these words.
"The said Corporation shall have full power to authorize the drawing of lotteries for effecting any important improvement in the City, which the ordinary funds or revenue thereof will not accomplish: Provided, that the sum to be raised in each year shall not exceed the amount of 10,000 dollars: And provided, also, that the object for which the money is intended to be raised shall be first submitted to the President of the United States, and shall be approved of by him."
Two questions arise on this act.
1st. Does it purport to authorize the Corporation to force the sale of these lottery tickets in States where such sales may be prohibited by law? If it does,
2d. Is the law constitutional?
If the first question be answered in the affirmative, it will become necessary to consider the second. If it should be answered in the negative, it will be unnecessary, and consequently improper, to pursue any inquiries, which would then be merely speculative, respecting the power of Congress in the case.
In inquiring into the extent of the power granted to the Corporation of Washington, we must first examine the words of the grant. We find in them no expression which looks beyond the limits of the City. The powers granted are all of them local in their nature, and all of them such as would, in the common course of things, if not necessarily, be exercised *442 within the city. The subject on which Congress was employed when framing this act was a local subject, it was not the establishment of a lottery, but the formation of a separate body for the management of the internal affairs of the City, for its internal government, for its police. Congress must have considered itself as delegating to this corporate body powers for these objects, and for these objects solely. In delegating these powers, therefore, it seems reasonable to suppose that the mind of the legislature was directed to the City alone, to the action of the being they were creating within the City, and not to any extra-territorial operations. In describing the powers of such a being, no words of limitation need be used. They are limited by the subject. But, if it be intended to give its acts a binding efficacy beyond the natural limits of its power, and within the jurisdiction of a distinct power, we should expect to find, in the language of the incorporating act, some words indicating such intention.
Without such words, we cannot suppose that Congress designed to give to the acts of the Corporation any other effect, beyond its limits, than attends every act having the sanction of local law, when any thing depends upon it which is to be transacted elsewhere.
If this would be the reasonable construction of corporate powers generally it is more especially proper in a case where an attempt is made so to exercise those powers as to control and limit the penal laws of a State. This is an operation which was not, *443 we think, in the contemplation of the legislature, while incorporating the City of Washington.
To interfere with the penal laws of a State, where they are not levelled against the legitimate powers of the Union, but have for their sole object the internal government of the country, is a very serious measure, which Congress cannot be supposed to adopt lightly, or inconsiderately. The motives for it must be serious and weighty. It would be taken deliberately, and the intention would be clearly and unequivocally expressed.
An act, such as that under consideration, ought not, we think, to be so construed as to imply this intention, unless its provisions were such as to render the construction inevitable.
We do not think it essential to the corporate power in question, that it should be exercised out of the City Could the lottery be drawn in any State of the Union? Does the corporate power to authorize the drawing of a lottery imply a power to authorize its being drawn without the jurisdiction of a Corporation, in a place where it may be prohibited by law? This, we think, would scarcely be asserted. And what clear legal distinction can be taken between a power to draw a lottery in a place where it is prohibited by law, and a power to establish an office for the sale of tickets in a place where it is prohibited by law? It may be urged, that the place where the lottery is drawn is of no importance to the Corporation, and therefore the act need not be so construed as to give power over the place, but that the right to sell tickets throughout the United *444 States is of importance, and therefore ought to be implied.
That the power to sell tickets in every part of the United States might facilitate their sale, is not to be denied; but it does not follow that Congress designed, for the purpose of giving this increased facility, to overrule the penal laws of the several States. In the City of Washington, the great metropolis of the nation, visited by individuals, from every part of the Union, tickets may be freely sold to all who are willing to purchase. Can it be affirmed that this is so limited a market, that the incorporating act must be extended beyond its words, and made to conflict with the internal police of the States, unless it be construed to give a more extensive market?
It has been said, that the States cannot make it unlawful to buy that which Congress has made it lawful to sell.
This proposition is not denied, and, therefore, the validity of a law punishing a citizen of Virginia for purchasing a ticket in the City of Washington, might well be drawn into question. Such a law would be a direct attempt to counteract and defeat a measure authorized by the United States. But a law to punish the sale of lottery tickets in Virginia, is of a different character. Before we can impeach its validity, we must inquire whether Congress intended to empower this Corporation to do any act within a State which the laws of that State might prohibit.
*445 In addition to the very important circumstance, that the act contains no words indicating such intention, and that this extensive construction is not essential to the execution of the corporate power, the Court cannot resist the conviction, that the intention ascribed to this act, had it existed, would have been executed by very different means from those which have been employed.
Had Congress intended to establish a lottery for those improvements in the City which are deemed national, the lottery itself would have become the subject of legislative consideration. It would be organized by law, and agents for its execution would be appointed by the President, or in such other manner as the law might direct. If such agents were to act out of the District, there would be, probably, some provision made for such a state of things, and in making such provisions Congress would examine its power to make them. The whole subject would be under the control of the government, or of persons appointed by the government.
But in this case no lottery is established by law, no control is exercised by the government over any which may be established. The lottery emanates from a corporate power. The Corporation may authorize, or not authorize it, and may select the purposes to which the proceeds are to be applied. This Corporation is a being intended for local objects only. All its capacities are limited to the City. This, as well as every other law it is capable of making, is a by-law, and, from its nature, is only co-extensive with the City. It is not probable that *446 such an agent would be employed in the execution of a lottery established by Congress, but when it acts, not as the agent for carrying into effect a lottery established by Congress, but in its own corporate capacity, from its own corporate powers, it is reasonable to suppose that its acts were intended to partake of the nature of that capacity and of those powers, and, like all its other acts, be merely local in its nature.
The proceeds of these lotteries are to come in aid of the revenues of the City. These revenues are raised by laws whose operation is entirely local, and for objects which are also local, for no person will suppose, that the President's house, the Capitol, the Navy Yard, or other public institution, was to be benefitted by these lotteries, or was to form a charge on the City revenue. Coming in aid of the City revenue, they are of the same character with it; the mere creature of a corporate power.
The circumstances, that the lottery cannot be drawn without the permission of the President, and that this resource is to be used only for important improvements, have been relied on as giving to this corporate power a more extensive operation than is given to those with which it is associated. We do not think so.
The President has no agency in the lottery. It does not originate with him, nor is the improvement to which its profits are to be applied to be selected by him. Congress has not enlarged the corporate power by restricting its exercise to cases of which the President might approve.
*447 We very readily admit, that the act establishing the seat of government, and the act appointing commissioners to superintend the public buildings, are laws of universal obligation. We admit, too, that the laws of any State to defeat the loan authorized by Congress, would have been void, as would have been any attempt to arrest the progress of the canal, or of any other measure which Congress may adopt. These, and all other laws relative to the District, have the authority which may be claimed by other acts of the national legislature, but their extent is to be determined by those rules of construction which are applicable to all laws. The act incorporating the City of Washington is, unquestionably, of universal obligation, but the extent of the corporate powers conferred by that act, is to be determined by those considerations which belong to the case.
Whether we consider the general character of a law incorporating a City, the objects for which such law is usually made, or the words in which this particular power is conferred, we arrive at the same result. The Corporation was merely empowered to authorize the drawing of lotteries, and the mind of Congress was not directed to any provision for the sale of the tickets beyond the limits of the Corporation. That subject does not seem to have been taken into view. It is the unanimous opinion of the Court, that the law cannot be construed to embrace it.
Judgment affirmed.
*448 JUDGMENT. This cause came on to be heard on the transcript of the record of the Quarterly Session Court for the Borough of Norfolk, in the Commonwealth of Virginia, and was argued by counsel. On consideration whereof, it is ADJUDGED and ORDERED, that the judgment of the said Quarterly Session Court for the Borough of Norfolk, in this case, be, and the same is hereby affirmed, with costs.
NOTES
[a] The plaintiff in error prayed an appeal from the judgment of the Court of Hustings, but it was refused, on the ground that there was no higher State tribunal which could take cognizance of the case.