# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 10, 2015        Decided January 29, 2016

No. 14-7082

ROSALIE SIMON, ET AL.,
APPELLANTS

v.

REPUBLIC OF HUNGARY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01770)

*Paul G. Gaston* argued the cause for appellants. With him on the briefs were *Charles S. Fax*, *Liesel Schopler*, *L. Marc Zell*, and *David H. Weinstein*.

*Konrad L. Cailteux* argued the cause for appellees. With him on the briefs was *Gregory Silbert*.

Before: HENDERSON, SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

Concurring opinion filed by *Circuit Judge* HENDERSON.

SRINIVASAN, *Circuit Judge*: This case arises out of one of humanity's darkest hours. In the summer of 1944, upon the arrival of German troops in Nazi-allied Hungary, the Hungarian government implemented an accelerated campaign to deport Hungarian Jews to Nazi death camps for extermination before the War's end. At the outset of the War, the Jewish population in Hungary numbered more than 800,000. By the end of the War, more than two-thirds of that population had been murdered, with the lion's share of victims killed at Auschwitz in a mere three-month period in 1944. Winston Churchill described the brutal, mass deportation of Hungarian Jews for extermination at Nazi death camps as "probably the greatest and most horrible crime ever committed in the history of the world."

The wartime wrongs inflicted upon Hungarian Jews by the Hungarian government are unspeakable and undeniable. The issue raised by this appeal is whether those wrongs are actionable in United States courts. Plaintiffs, fourteen Jewish survivors of the Hungarian Holocaust, bring various causes of action against the Republic of Hungary and the Hungarian state-owned railway arising from the defendants' participation in—and perpetration of—the Holocaust. The district court dismissed the suit, holding that the Foreign Sovereign Immunities Act's treaty exception grants the Hungarian defendants immunity. The court concluded that the 1947 Peace Treaty between the Allied Powers and Hungary set forth an exclusive mechanism for Hungarian Holocaust victims to obtain recovery for their property losses, and that permitting the plaintiffs' lawsuit to proceed under the FSIA would conflict with the peace treaty's terms.

We hold that the peace treaty poses no bar to the plaintiffs' lawsuit. While the treaty secures an obligation by Hungary to provide compensation for property interests

confiscated from Hungarian Jews during the War, that obligation is not exclusive of other, extra-treaty means of recovery like the causes of action asserted in this case. As a result, the FSIA's treaty exception does not preclude this action.

Plaintiffs, however, still must overcome the FSIA's default grant of immunity to foreign sovereigns. We hold that the FSIA's expropriation exception affords plaintiffs a pathway to pursue certain of their claims: those involving the taking of the plaintiffs' property in the commission of genocide against Hungarian Jews. Because those expropriations themselves amount to genocide, they qualify as takings of property "in violation of international law" within the meaning of the FSIA's expropriation exception. We further hold that the plaintiffs' claims do not constitute non-justiciable political questions falling outside of the Judiciary's cognizance. We leave for the district court to consider on remand whether, as a matter of international comity, the plaintiffs must first exhaust available remedies in Hungary before proceeding with their claims in United States courts.

## I.

### A.

The Hungarian government, a wartime ally of Nazi Germany, began a systematic campaign of discrimination against Hungarian Jews as early as 1941. Hungary stripped some Hungarian Jews of their Hungarian citizenship, forced others into internment camps or slave labor battalions, expelled others from public or professional employment, and pressed still others into exile. But as of 1944—"on the very eve of triumph over the barbarism which their persecution symbolize[d]"—Hungarian Jews, "while living under

persecution[,] ha[d] at least found a haven" from widespread extermination in the Holocaust. Franklin D. Roosevelt, Statement on Opening Frontiers to War Victims and Justice for War Crimes, The American Presidency Project (Mar. 24, 1944). That reprieve from the Holocaust's very worst horrors would not persist.

In 1943, the Soviet Red Army dealt the Nazi Wehrmacht and its allies a decisive blow at the battle of Stalingrad (now Volgograd). The complete destruction of the German Sixth Army turned the tide of war on the Eastern Front. And on the Western Front, less than twenty-six months later—after the Normandy landing and ensuing battles—American and Soviet forces would meet at the Elbe River, in Torgau, Germany. Within three days of that meeting, Adolf Hitler would be dead by his own hand.

The Hungarian government sensed the sea change attending the crushing defeat of the Nazis at Stalingrad. Fearing the imminent Soviet advance, Hungary sought to negotiate a separate peace with the United States, Great Britain, and the other Western Allies. But Germany, desperate to stave off Hungarian capitulation, rushed Nazi troops into Hungary in March 1944. The Hungarian parliament then ousted the existing government and installed the fanatically anti-Semitic Döme Sztójay as Prime Minister.

The new Sztójay government, in collaboration with German Nazis, embarked on a policy of total destruction of Hungary's Jewish population. "Nowhere was the Holocaust executed with such speed and ferocity as it was in Hungary." Compl. ¶ 1. Within a period of three months in 1944, nearly half a million Hungarian Jews were murdered.

First came persecution. Building on previous efforts to marginalize Jews in society, the new Hungarian government forbade Jews from traveling, wearing military or school uniforms, eating in public restaurants, or using public pools. Hungary banned books by Jewish authors from schools and libraries. As of April 5, 1944, all Jews had to wear the identifying yellow star.

Next came property confiscation and ghettoization. Pursuant to government decrees, Hungary forced all Jews into ghettos, where they were "stripped of protective clothing, exposed to the elements, [and] deprived of sanitary facilities." *Id.* ¶ 101. Hungarian officials went home to home, inventorying and confiscating Jewish property.

Finally came extermination in the death camps. With the Hungarian government rapidly implementing Hitler's Final Solution, incarceration in the ghettos lasted but a few weeks. Hungarian authorities marched Jews from the ghettos to railroad stations, where they were divested of what little property—typically suitcases, clothes, and hidden valuables—they had managed to retain to that point. Within a mere three months, the majority of Hungarian Jews had been transported via railroad from the ghettos to Auschwitz and other death camps. Ninety percent of those sent to Auschwitz and the other camps were murdered upon arrival.

By January 17, 1945, Soviet troops had arrived in Budapest. But by then, over 560,000 Hungarian Jews—out of a pre-War population of nearly 825,000—had perished. The overwhelming majority of those deaths came from the roughly 430,000 Hungarian Jews deported to Auschwitz and other camps during those three months in 1944.

6

B.

Because this case comes to us on a grant of dismissal in favor of the defendants on grounds of sovereign immunity, we assume the factual allegations in the complaint to be true. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002). The named plaintiffs in this case are fourteen Jewish survivors of the Hungarian Holocaust. All fourteen were Hungarian nationals during World War II, but have since adopted other nationalities. Twelve of the plaintiffs were among the hundreds of thousands transported to Auschwitz, but they beat the overwhelming odds and survived.

The plaintiffs filed suit in the United States District Court for the District of Columbia against the Republic of Hungary (Hungary), the state-owned Hungarian railway, Magyar Allamvastuak Zrt. (MÁV, and, with Hungary, referred to as the Hungarian defendants), and Rail Cargo Hungaria Zrt. (RCH), an Austrian freight-rail company that is the successor-in-interest to MÁV's World War II-era freight division. The plaintiffs allege that the Republic of Hungary collaborated with the Nazis to exterminate Hungarian Jews and to expropriate their property. The defendant railways, the plaintiffs contend, voluntarily played an integral role in that effort—specifically by transporting Hungarian Jews to death camps, and, at the point of embarkation, confiscating the property of those about to be deported. The complaint asserts causes of action ranging from the common law torts of conversion and unjust enrichment for the plaintiffs' property loss, to false imprisonment, torture, and assault for their personal injuries, to international law violations. The complaint seeks certification of a class of plaintiffs and, as relief, seeks compensatory damages, punitive damages, and various forms of equitable relief.

The defendants moved for dismissal of the claims. The Hungarian defendants argued as alternate grounds for dismissal: that they were immune from suit under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1603 *et seq.*; that the case presented a non-justiciable political question; and that the case should be dismissed under the doctrine of *forum non conveniens*. The district court concluded that the FSIA granted the Hungarian defendants immunity from suit. *See Simon v. Republic of Hungary*, 37 F. Supp. 3d 381, 408-24 (D.D.C. 2014). Accordingly, the court dismissed the claims against the Hungarian defendants for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). (The court also dismissed the claims against RCH based on the lack of personal jurisdiction over the company, 37 F. Supp. 3d at 425-44; *see* Fed. R. Civ. P. 12(b)(2), but the plaintiffs raise no challenge to the dismissal of RCH in this appeal.)

## II.

The plaintiffs appeal the dismissal of their claims against the Hungarian defendants—the Republic of Hungary and MÁV. We review *de novo* the district court's dismissal of the claims for lack of subject-matter jurisdiction. *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 874 (D.C. Cir. 2014). "When reviewing a plaintiff's unchallenged factual allegations to determine whether they are sufficient to deprive a . . . defendant of sovereign immunity, we assume those allegations to be true." *Price*, 294 F.3d at 93.

The parties agree that, for purposes of qualifying for sovereign immunity under the FSIA, the Republic of Hungary is a "foreign state," and MÁV, a corporation wholly-owned by the Republic of Hungary, is an "agency or instrumentality" of the Hungarian state. 28 U.S.C. § 1603(a)-(b). In the United States, the sole avenue for a court to obtain

jurisdiction over claims against a foreign state or its agencies and instrumentalities is through the FSIA, 28 U.S.C. §§ 1603 *et seq*. *See Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005).

The FSIA establishes a default rule granting foreign sovereigns immunity from the jurisdiction of United States courts. *See* 28 U.S.C. § 1604; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015). That baseline grant of immunity, however, is subject to a number of exceptions. *See* 28 U.S.C. §§ 1605-07; *see also id.* § 1604. The plaintiffs argue that their claims fit within the FSIA's "expropriation exception," which provides jurisdiction over certain claims involving "rights in property taken in violation of international law." *Id.* § 1605(a)(3). The Hungarian defendants contend that the expropriation exception is inapplicable here. They further argue that the FSIA's "treaty exception," *see id.* § 1604, in any event divests the district court of any jurisdiction it might otherwise have under the expropriation exception.

We first address the treaty exception, the ground upon which the district court rested its decision to dismiss the plaintiffs' claims. Finding the treaty exception inapplicable, we next examine whether the plaintiffs' claims implicate the FSIA's expropriation exception, which, as noted, creates an exception to foreign sovereign immunity for claims involving property "taken in violation of international law." *Id.* § 1605(a)(3). We hold that in the particular circumstances of this case—involving confiscations of property that themselves constitute the commission of genocide—certain of plaintiffs' claims against the Hungarian defendants may proceed under the FSIA's expropriation exception.

9

A.

The FSIA's baseline grant of immunity to foreign sovereigns is "[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment of th[e] Act." 28 U.S.C. § 1604. That proviso is known as the FSIA's treaty exception. Under the treaty exception, "if there is a conflict between the FSIA and such an agreement regarding the availability of a judicial remedy against a contracting state, the agreement prevails." *de Csepel v. Republic of Hungary*, 714 F.3d 591, 601 (D.C. Cir. 2013) (quoting *Moore v. United Kingdom*, 384 F.3d 1079, 1085 (9th Cir. 2004) (punctuation omitted)). "Any conflict between a [pre-existing] treaty and the FSIA immunity provisions, whether toward more or less immunity, is within the treaty exception." *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 669 (7th Cir. 2012); *accord Moore*, 384 F.3d at 1084-85. As a result, in a case like this one, in which a pre-existing treaty is said to confer *more* immunity than would the FSIA, the treaty exception would override any of the FSIA's exceptions to immunity under which the claims otherwise could go forward.

1.

In this case, the Hungarian defendants' claim of immunity under the treaty exception rests on the 1947 Peace Treaty between Hungary and the Allied Powers (including the United States). Treaty of Peace with Hungary (1947 Treaty), Feb. 10, 1947, 61 Stat. 2065, 41 U.N.T.S. 135. The 1947 Treaty is an "international agreement[] to which the United States [was] a party at the time of the enactment of" the FSIA (in 1976). 28 U.S.C. § 1604. The treaty settled myriad issues arising out of wartime hostilities, covering topics as varied as the location of Hungary's post-war frontiers and the

regulation of Hungarian railway rates. *See* 1947 Treaty arts. 1, 34.

The 1947 Treaty also contained provisions addressing the payment of compensation for (or the restoration of) property rights and interests seized by the Hungarian government during the war. Article 26 pertained to property rights and interests formerly held by non-Hungarian nationals. Article 27 addressed "persons under Hungarian jurisdiction"— Hungarian nationals. *Id.* art. 27(1).

Article 27 is of particular salience here. In that article, Hungary agreed:

> [T]hat in all cases where the property, legal rights or interests in Hungary of persons under Hungarian jurisdiction have, since September 1, 1939, been the subject of . . . confiscation . . . on account of the racial origin or religion of such persons, the said property, legal rights and interests shall be restored . . . or, if restoration is impossible, that fair compensation shall be made therefor.

*Id.* If any such property held by the Hungarian government remained unclaimed six months after the treaty's effective date, Article 27 further provided that the property would be transferred to relief organizations representing Holocaust victims. *Id.* art. 27(2). The transferred property was then to "be used by such organisations for purposes of relief and rehabilitation of surviving" victims. *Id.*

Article 40 of the treaty specified a three-tiered process for resolving "any dispute concerning the interpretation or execution of the Treaty." *Id.* art. 40(1). At the first stage, the

treaty signatories engaged in the dispute—*e.g.*, the United States and Hungary—would seek resolution through "direct diplomatic negotiations." *Id.* If negotiations failed, the second stage would refer the dispute to the chief diplomats of the United States, Soviet Union, and United Kingdom, who were assigned to represent the Allied Powers "in dealing with the Hungarian Government in all matters concerning the execution and interpretation of" the treaty. *Id.* arts. 39, 40(1). Should those "Heads of Mission" fail to reach a resolution within two months, the dispute would move to the third stage, in which a three-member commission—one representative from each aggrieved party plus an independent third party— would render a final resolution. *Id.* art. 40(1).

2.

The Hungarian defendants argue that the 1947 Treaty precludes jurisdiction over the plaintiffs' claims via the FSIA's treaty exception. Article 27, the defendants observe, expressly obligates Hungary to provide compensation or restitution for property rights and interests taken from Hungarian Holocaust victims. *See id.* art. 27(1)-(2). Consequently, the defendants' argument goes, the plaintiffs' actions seeking recovery for Hungary's taking of their property necessarily amount to a challenge to the adequacy of Hungary's efforts to comply with its treaty obligations under Article 27. Any challenge to the adequacy of Hungary's measures under Article 27, the defendants contend, must be pursued through Article 40, which provides for an exclusive, non-judicial dispute resolution process for "any dispute concerning the interpretation or execution of the Treaty." *Id.* art. 40(1). Because the plaintiffs seek relief outside of Article 40's dispute resolution framework, the defendants conclude, the plaintiffs' claims conflict with the 1947 Treaty and are foreclosed by the FSIA's treaty exception.

Addressing essentially the same argument (on the same facts), the Seventh Circuit, in a brief analysis, rejected the defendants' argument that the 1947 Treaty overrides any otherwise available bases for jurisdiction under the FSIA. *Abelesz*, 692 F.3d at 695-96. The district court here, in a comprehensive and thoughtful decision, reached the opposite conclusion, accepting the Hungarian defendants' argument that Articles 27 and 40 of the 1947 Treaty, via the FSIA's treaty exception, bar the plaintiffs' action. We ultimately agree with the Seventh Circuit and hold that the 1947 Treaty does not preclude the plaintiffs' suit.

For the Hungarian defendants to prevail in their argument under the FSIA's treaty exception, they would need to show that Article 27 of the 1947 Treaty establishes the *exclusive* means by which Hungarian Holocaust victims can seek compensation for (or restoration of) property taken from them during the War. If Article 27 establishes an exclusive means of recovery, a Hungarian Holocaust victim could seek relief only through that mechanism. If she believes that the relief available through Article 27 is deficient in some manner, her concerns could be aired only through Article 40's state-to-state, dispute resolution process—the exclusive means of resolving any dispute about Hungary's implementation of the treaty. *See* 1947 Treaty, art. 40(1). But if Article 27's establishment of an obligation by Hungary to provide compensation for expropriated property is *not* exclusive of other means of recovery that may exist, *see id.* art. 27(1), Article 40 then would not foreclose the plaintiffs' suit: while Article 40 sets out the sole means of resolving disputes concerning implementation of the 1947 Treaty, it has no bearing on any claims arising outside the treaty's auspices.

We adopt that latter understanding of Article 27. In particular, we understand Article 27 to establish a minimum

obligation by Hungary to provide restoration or compensation to Hungarian Holocaust victims for their property losses. But while Article 27 secures one mechanism by which Hungarian victims may seek recovery, it does not establish the *exclusive* means of doing so.

"The interpretation of a treaty . . . begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506 (2008). The terms of Article 27 do not speak in the language of exclusivity. Although Article 27 provides certain rights to the Hungarian victims of the Holocaust pertaining to their property losses, it says nothing about whether those rights are exclusive of other claims Hungarian Holocaust victims might bring, such as the causes of action asserted by the plaintiffs here.

Other treaties concluding World War II hostilities, by contrast, contain language expressly establishing a final *and exclusive* resolution of war-related claims. The treaty ending the War in the Pacific "recognized that Japan should pay reparations to the Allied Powers for the damage and suffering caused by it during the war." Treaty of Peace with Japan art. 14(a), Sept. 8, 1951, 3 U.S.T. 3169. After elaborating on the contours of that obligation—including the entitlement of the Allied Powers to seize and retain certain property rights and interests of Japan and Japanese nationals—the treaty explicitly foreclosed extra-treaty claims against Japan: "Except as otherwise provided in the present Treaty, the Allied Powers waive all reparations claims of the Allied Powers [and] other claims of the Allied Powers and their nationals arising out of any actions taken by Japan and its nationals in the course of the prosecution of the war." *Id.* art. 14(b); *see Joo v. Japan*, 413 F.3d 45, 49-50 (D.C. Cir. 2005).

Article 27 of the 1947 Treaty contains no comparable waiver of extra-treaty claims against Hungary. The absence

of any such waiver language in Article 27 is all the more notable given that the 1947 Treaty itself contains an express waiver of certain other claims (albeit claims by Hungary rather than claims against it): "Hungary waives all claims of any description against the Allied and Associated Powers on behalf of the Hungarian Government or Hungarian nationals arising directly out of the war." 1947 Treaty art. 32(1); *see id.* art. 30(4).

The context of Article 27 further weighs against construing it to foreclose extra-treaty claims by Hungarian Holocaust victims. A sovereign generally has the authority to espouse and "settle the claims of its nationals against foreign countries." *Dames & Moore v. Regan*, 453 U.S. 654, 679 (1981). That authority may be exercised in the terms of a peace treaty. As the treaty with Japan illustrates, a signatory may resolve the claims of its nationals against its wartime enemy in a peace treaty, including by waiving any alternate, extra-treaty means of relief. In fact, the Supreme Court long ago suggested that a treaty of peace, by its very nature, may be seen to have the effect of finally settling the wartime claims of one signatory nation (and its nationals) against the other party. *See Ware v. Hylton*, 3 U.S. 199, 230 (1796) (Chase, J.). If so, any treaty provisions addressing such claims necessarily would be exclusive of extra-treaty relief.

Article 27 of the 1947 Treaty involves a fundamentally different situation, however. Article 27 does not address the claims of one signatory nation (and its nationals) against the *other side* to the agreement. Rather, Article 27 secures a means by which one signatory's nationals (Hungarian Holocaust victims) can obtain relief against *their own* government. We have been made aware of no precedent for understanding such a provision to preclude extra-treaty claims. After all, while a sovereign can espouse and

extinguish the claims of its *own* nationals, it has no authority to espouse and extinguish the claims of *another state's* nationals.

As a result, the United States and the other Allied Powers who executed the 1947 Treaty with Hungary lacked the power to eliminate (or waive) the claims of another state's—*i.e.*, Hungary's—nationals in the treaty's terms. They could, and did, impose an obligation on Hungary to provide a *minimum* means of recovery to Hungarian victims for Hungary's wartime wrongs, which is our understanding of Article 27. But they could not render that means of recovery an exclusive one because they had no power to settle or waive the extra-treaty claims of another country's (Hungary's) nationals. And while the Allied powers did possess the narrower power to control the use of their own courts as forums for the presentation of such claims, we do not read Article 27 to speak to the use of an Allied nation's courts for extra-treaty wartime claims by Hungarian victims: Article 27 contains no language addressing where any extra-treaty claims by Hungarian victims may be brought, or specifying whether Allied nations' courts may be used as forums for such claims.

The Hungarian defendants point to the settlement of certain wartime, property-related claims in various countries' bilateral agreements with Hungary, including a 1973 Executive Agreement between the United States and Hungary that addressed the property claims of United States nationals against Hungary. *See* Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, Mar. 6, 1973, 24 U.S.T. 522. Those intergovernmental accords, the defendants contend, show that the only way of resolving claims outside of an Article 27 mechanism is through Article 40's process of direct state-to-

state negotiations, not through extra-treaty, judicial causes of action brought by individuals.

Again, however, those bilateral agreements involved one nation's espousal and settlement of its own nationals' claims against another nation (Hungary). There is little reason to suppose that the parties to the 1947 Treaty would have similarly relied on the Article 40 process of state-to-state negotiations as the exclusive means of resolving claims encompassed by Article 27—*i.e.*, claims by Hungarian nationals against Hungary itself. Because those claims lay against their own government, Hungarian victims in 1947 would have had no obvious nation to speak and negotiate on their behalf against Hungary in any Article 40, state-to-state process. We thus conclude that the Allied Powers envisioned Article 27 as securing *at least* one means by which Hungarian victims could seek recovery against Hungary, but not to the exclusion of any alternate, extra-treaty actions that might be available to them.

The Hungarian defendants also emphasize Article 27(2)'s requirement that "[a]ll property . . . remaining heirless or unclaimed for six months after the coming into force of the present Treaty, shall be transferred by the Hungarian Government to organisations in Hungary representative of such persons, organisations or communities," for further distribution to Holocaust victims. 1947 Treaty art. 27(2). Because that provision calls for the distribution of "[a]ll" property confiscated from Hungarian Holocaust victims and retained by the Hungarian government, the defendants argue, Article 27 must provide the exclusive source of relief for those victims. Otherwise, the defendants contend, Hungary might face a double-penalty: once when it distributed property to relief organizations under Article 27, and a second time when a plaintiff seeks compensation for the same

property in an extra-treaty action even though Hungary no longer possesses it. We are unpersuaded by the defendants' argument.

Much of the property confiscated by Hungary from its nationals during the War was lost or destroyed in the conflict—indeed, the defendants themselves argue as much. *See* Appellees' Br. 38. Hungary therefore would have had nothing to transfer to relief organizations under Article 27(2) with regard to many of the potential claims by Holocaust victims. Article 27(2)'s requirement that Hungary transfer confiscated property to relief organizations thus was not intended to foreclose extra-treaty means of recovery. It instead apparently was aimed to assure that the Hungarian government would devote any remaining property to relief efforts for Hungarian victims rather than retain the property for a different use. In fact, even if Article 27 were construed to establish an exclusive mechanism for recovery, Hungary would *still* confront the possibility of the same sort of double-penalty: Article 27(1) requires Hungary to provide compensation to victims whose property cannot be restored, *see* 1947 Treaty art. 27(1), as would be the case when a claimant seeks recovery pursuant to Article 27(1) for property already transferred to a relief organization.

For those reasons, we hold that Article 27 secures one means by which Hungarian victims can seek recovery against Hungary for their wartime property losses, but not to the exclusion of other available remedies. Because the plaintiffs in this case have brought causes of action arising outside of the 1947 Treaty, their action creates no express conflict between an "existing international agreement[]" and the FSIA's other immunity exceptions for purposes of the FSIA's treaty exception. 28 U.S.C. § 1604.

18

B.

Although the FSIA's treaty exception does not foreclose jurisdiction over the plaintiffs' claims, the plaintiffs still must overcome the FSIA's default rule granting immunity to the Hungarian defendants. The plaintiffs argue that the FSIA's expropriation exception, *see* 28 U.S.C. § 1605(a)(3), allows for jurisdiction over their claims. We agree that jurisdiction exists as to those of the plaintiffs' claims that directly implicate rights in property.

The FSIA's expropriation exception strips a foreign sovereign's immunity against claims:

> [I]n which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

*Id.* A claim thus must meet three requirements to fit within the FSIA's expropriation exception: (i) the claim must be one in which "rights in property" are "in issue"; (ii) the property in question must have been "taken in violation of international law"; and (iii) one of two commercial-activity nexuses with the United States must be satisfied. *See Peterson*, 416 F.3d at 86; *see also Abelesz*, 692 F.3d at 671.

Because the district court concluded that the FSIA's treaty exception bars jurisdiction over the plaintiffs' action, the court did not reach any holding on the FSIA's expropriation exception. *See Simon*, 37 F. Supp. 3d at 407 n.21. While we ordinarily do not decide an issue unaddressed by the district court, the parties have thoroughly briefed and presented the applicability of the expropriation exception and asked us to decide it. We think it appropriate in the circumstances to take up the parties' invitation and resolve that issue in the first instance.

At the outset, we address the standards by which to assess whether the plaintiffs' claims fall within the terms of §1605(a)(3). In prior FSIA cases involving the expropriation exception, this court has held that, in assessing whether "rights in property taken in violation of international law are in issue," the plaintiff need only make a "non-frivolous" showing at the jurisdictional stage. *See Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 811-12 (D.C. Cir. 2015); *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940-41 (D.C. Cir. 2008). That is because, in those cases, the plaintiff's claim on the merits directly mirrored the jurisdictional standard. The plaintiff brought a basic expropriation claim asserting that its property had been taken without just compensation in violation of international law. *See Helmerich*, 784 F.3d at 810; *Chabad*, 528 F.3d at 938, 941; *see also* Restatement (Third) of the Foreign Relations Law of the United States § 712(1) (Am. Law Inst. 1987). The same showing must be made to establish jurisdiction under the FSIA's expropriation exception, which likewise calls for assessing whether the property was "taken in violation of international law." 28 U.S.C. § 1605(a)(3). When the jurisdictional and merits inquiries fully overlap in that fashion, a plaintiff need not prove a winning claim on the merits merely to establish

jurisdiction. Rather, the plaintiff need only show that its claim is "non-frivolous" at the jurisdictional stage, and then must definitively prove its claim in order to prevail at the merits stage. *See Bell v. Hood*, 327 U.S. 678, 682 (1946); *Helmerich*, 784 F.3d at 811-12; *Chabad*, 528 F.3d at 940-42.

This case differs from those prior cases involving the FSIA's expropriation exception. Here, the plaintiffs' claim on the merits is not an expropriation claim asserting a taking without just compensation in violation of international law. The plaintiffs instead seek recovery based on garden-variety common-law causes of action such as conversion, unjust enrichment, and restitution. The plaintiffs plead a "violation of international laws" only to "give rise to jurisdiction" under the FSIA's expropriation exception, Compl. ¶ 207, not to establish liability on the merits. Unlike in our prior cases, consequently, the international-law violation at issue here— genocide—bears solely on jurisdiction under § 1605(a)(3).

When, as here, the jurisdictional and merits inquiries do not overlap, there is no occasion to apply the "exceptionally low bar" of non-frivolousness at the jurisdictional stage. *Helmerich*, 784 F.3d at 812. To establish jurisdiction in such a situation, we therefore ask for more than merely a non-frivolous argument. Instead, we assess whether the plaintiffs' allegations satisfy the jurisdictional standard. *See Chabad*, 528 F.3d at 940. We now examine whether that showing has been made under the FSIA's expropriation exception.

1.

Our analysis begins with the expropriation exception's first requirement: that the claims are ones in which "rights in property" are "in issue." 28 U.S.C. § 1605(a)(3). The plaintiffs have alleged numerous causes of action, ranging

from conversion of their property, to torture, to wrongful death. The FSIA's expropriation exception is not so broad as to cover all of the plaintiffs' claims.

We make FSIA immunity determinations on a claim-by-claim basis, *see Abelesz*, 692 F.3d at 697; *Fagot Rodriguez v. Republic of Costa Rica*, 297 F.3d 1, 13 (1st Cir. 2002); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 706 (9th Cir. 1992), and "[c]laims against foreign sovereigns that do not fall within the ambit of an FSIA exception are barred." *Abelesz*, 692 F.3d at 697. Section 1605(a)(3) applies only to claims implicating "rights *in property*." The exception therefore affords no avenue by which to "bring claims for personal injury or death"—or any other non-property-based claims. *Abelesz*, 692 F.3d at 697; *see id.* at 677. Because the plaintiffs offer no alternate jurisdictional basis for their non-property-based causes of action, we affirm the district court's determination that it lacked jurisdiction over those claims.

Certain of the plaintiffs' claims, however, place "rights in property . . . in issue" within the meaning of the expropriation exception. 28 U.S.C. § 1605(a)(3). Their conversion claim, for instance, asserts that they "had the right to possess personal property that was taken from them by the defendants." Compl. ¶ 165 (Count I). Their unjust enrichment claim likewise contends that they "were deprived of their personal property by the defendants" and that "[i]t would be inequitable and unconscionable for the defendants to continue to enjoy the benefits of possession and use of the plaintiffs' personal property." *Id.* ¶¶ 170, 172 (Count II). In the same vein, their restitution claim alleges that their "personal property was taken . . . , denying them the use and enjoyment thereof," and that the "defendants have wrongfully used and profited from that property." *Id.* ¶ 203 (Count XV).

Those sorts of claims place "rights in property . . . in issue" within the meaning of the FSIA's expropriation exception.

Decisions applying another FSIA exception—the immovable-property exception, 28 U.S.C. § 1605(a)(4)—are instructive. That exception similarly turns on whether "rights in property" are "in issue," allowing for jurisdiction when "rights in immovable property situated in the United States are in issue." *Id.* In *Permanent Mission of India v. City of New York*, the Supreme Court held that an action seeking to establish the validity of a tax lien imposed on real property falls within the immovable-property exception. 551 U.S. 193 (2007). A tax lien on property qualifies as a property interest, the Court explained, and "a suit to establish the validity of a lien" thus "implicates rights in . . . property." *Id.* at 199. Our court has similarly concluded that "disputes directly implicating property interests or rights to possession" are ones in which "rights in . . . property" are "in issue" for purposes of the immovable-property exception. *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1520-22 (D.C. Cir. 1984) (Scalia, J.).

Here, a number of the plaintiffs' claims seek recovery arising from the Hungarian defendants' confiscation of the plaintiffs' property. We leave it to the district court on remand to determine precisely which of the plaintiffs' claims "directly implicat[e] property interests or rights to possession," *id.*, thus satisfying the "rights in property . . . in issue" requirement of § 1605(a)(3).

2.

The next question is whether the plaintiffs' claims involve property "taken in violation of international law." 28 U.S.C. § 1605(a)(3). We conclude that the answer is yes.

The alleged takings of property in this case amounted to the commission of genocide, and genocide violates international law. The plaintiffs' property therefore was "taken in violation of international law." *Id.*

a.

It is undisputed that genocide itself is a violation of international law. *See, e.g.*, *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n.20 (D.C. Cir. 1984) (Edwards, J., concurring); *accord Abelesz*, 692 F.3d at 675-76 (collecting authority). The question then becomes whether the takings of property described in the complaint bear a sufficient connection to genocide that they amount to takings "in violation of international law." 28 U.S.C. § 1605(a)(3). We hold that they do. In our view, the alleged takings did more than effectuate genocide or serve as a means of carrying out genocide. *See Abelesz*, 692 F.3d at 675-76. Rather, we see the expropriations *as themselves genocide*. It follows necessarily that the takings were "in violation of international law." 28 U.S.C. § 1605(a)(3).

The legal definition of genocide encompasses the expropriations alleged in this case. The Convention on the Prevention of the Crime of Genocide, adopted by the United Nations in the immediate aftermath of World War II and ratified or acceded to by nearly 150 nations (including the United States), defines genocide as follows:

> [A]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
>
> (a) Killing members of the group;

(b) Causing serious bodily or mental harm to members of the group; [or]

(c) *Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part . . .*

Convention on the Prevention and Punishment of the Crime of Genocide (Genocide Convention), art. 2, Dec. 9, 1948, 78 U.N.T.S. 277 (emphasis added). That definition is "generally accepted for purposes of customary [international] law." Restatement (Third) of the Foreign Relations Law of the United States § 702 cmt. d. It appears not only in the Genocide Convention itself, but also in numerous other international treaties. *See, e.g.*, Rome Statute of the International Criminal Court art. 6, July 17, 1998, 2187 U.N.T.S. 90; Statute of the International Tribunal for Rwanda art. 2 (1994); Statute of the International Criminal Tribunal for the Former Yugoslavia art. 4 (1993). The offense of genocide under our domestic law uses the same definition. *See* 18 U.S.C. § 1091(a).

For our purposes, the pivotal acts constituting genocide are those set out in subsection (c) of the definition. The complaint describes takings of property intended to "[d]eliberately inflict[] on the group conditions of life calculated to bring about its physical destruction in whole or in part." Genocide Convention art. 2(c). Indeed, the Genocide Convention's history indicates that paragraph (c) aimed *precisely* to capture the practice of expropriation and ghettoization in the Holocaust. A delegate to the drafting committee specifically "referred to the destructive living conditions in the Jewish Ghettos within German[-]occupied territory during the Second World War as an example of the sort of conditions falling within the purview of (a draft version) of paragraph (c)." Christian J. Tams, Lars Berster &

Bjorn Schiffbauer, Convention on the Prevention of Genocide: A Commentary 122 (2014) (citing [U.N. Doc. E/AC 25/SR 414]); *see also* Int'l Criminal Court, Elements of Crimes, art. 6(c) n.4 (2011) (stating that genocide under paragraph (c) "may include, but is not necessarily restricted to . . . systematic expulsion from homes").

The Holocaust's pattern of expropriation and ghettoization entailed more than just moving Hungarian Jews to inferior, concentrated living quarters, or seizing their property to finance Hungary's war effort. Those sorts of actions would not alone amount to genocide because of the absence of an intent to destroy a people. The systematic, "wholesale plunder of Jewish property" at issue here, however, aimed to deprive Hungarian Jews of the resources needed to survive as a people. *de Csepel*, 714 F.3d at 594. Expropriations undertaken for the purpose of bringing about a protected group's physical destruction qualify as genocide.

The complaint describes the plaintiffs' experiences in just those terms. As the complaint sets out, the Hungarian Holocaust proceeded in a series of steps and included the taking of property and ghettoization at various points in that process: "The Nazis . . . achieved [the Final Solution] by first isolating [Jews], then expropriating the Jews' property, then ghettoizing them, then deporting them to the camps, and finally, murdering the Jews and in many instances cremating their bodies." Compl. ¶ 91. The ghettoization effort included, as an integral component, the confiscation of the Jews' personal property. *Id.* ¶ 3. "Hungarian officials stripped Jews . . . of their valuable possessions when they were transferred into the Jewish [ghettos]," *id.* ¶ 82, and, once in the ghettos, Jews were "stripped of protective clothing, exposed to the elements, [and] deprived of sanitary facilities," *id.* ¶ 101. The plaintiffs' individual experiences with

ghettoization exemplified that pattern. *See id.* ¶¶ 23, 29, 31, 42, 66, 73, 80. And the defendants confiscated any personal property remaining in the victims' possession before transferring them via railroad to the Nazi death camps. *See id.* ¶¶ 12, 16, 19, 32, 39, 43, 54, 68, 74, 80.

Because the plaintiffs thereby allege the requisite genocidal acts and intent, their jurisdictional allegations suffice as a legal matter to bring their property-based claims within the FSIA's expropriation exception. *See Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). If the defendants were to challenge the factual basis of those allegations on remand, the district court would need to go beyond the pleadings and resolve the factual dispute. *See id.* For present purposes, it is enough to note that the complaint describes takings of property that are *themselves* genocide within the legal definition of the term. Such expropriations constitute "tak[ings] in violation of international law." 28 U.S.C. § 1605(a)(3).

b.

The defendants nonetheless contend that the expropriations of property set out in the complaint were not "in violation of international law." The defendants rely on the so-called "domestic takings rule," under which, "generally, a foreign sovereign's expropriation of its own national's property does not violate international law." *Helmerich*, 784 F.3d at 812; *see United States v. Belmont*, 301 U.S. 324, 332 (1937). Because the plaintiffs were Hungarian nationals at the time of Hungary's alleged expropriations, the defendants argue, the domestic takings rule renders those takings non-actionable under international law. We disagree. The domestic takings rule has no application in the unique circumstances of this case, in which, unlike in most cases

involving expropriations in violation of international law, *genocide* constitutes the pertinent international-law violation.

International law has long prohibited a sovereign from expropriating the property of another state's nationals without payment of just compensation. *See, e.g.*, Restatement (Third) of the Foreign Relations Law of the United States § 712(1); Restatement (Second) of the Foreign Relations Law of the United States §§ 185, 186 (Am. Law Inst. 1965). That basic international-law prohibition against uncompensated expropriations, however, has always generally exempted intrastate takings. A sovereign's expropriation of its own national's property might violate the state's own domestic laws, but it is ordinarily not a concern of international law. *See Belmont*, 301 U.S. at 332; *Helmerich*, 784 F.3d at 812. That understanding, captured by the domestic takings rule, manifests the broader reluctance of nations to involve themselves in the domestic politics of other sovereigns. *See Abelesz*, 692 F.3d at 674-75. The domestic takings rule means that, as a general matter, a plaintiff bringing an expropriation claim involving an intrastate taking cannot establish jurisdiction under the FSIA's expropriation exception because the taking does not violate international law. *See Republic of Austria v. Altmann*, 541 U.S. 677, 712 (2004) (Breyer, J., concurring); *Siderman*, 965 F.2d at 711.

In this case, however, the plaintiffs do not bring a basic international-law expropriation claim. Accordingly, the international-law violation on which the plaintiffs premise their argument for jurisdiction under § 1605(a)(3) is not the traditional prohibition against uncompensated takings. Rather, the relevant international-law violation for jurisdictional purposes is *genocide*. *See* Compl. ¶ 207. Genocide perpetrated by a state against its own nationals of course is a violation of international law. *See generally*

Genocide Convention art. 2; *see, e.g.*, *Kadic v. Karadzic*, 70 F.3d 232, 241-42 (2d Cir. 1995). The international-law prohibition against genocide in fact was a direct reaction to the actions of sovereigns against their own citizens. The Hungarian Holocaust is a paradigmatic example. Genocidal expropriations of the property of a sovereign's own nationals thus are "tak[ings] in violation of international law" for purposes of the FSIA's expropriation exception. 28 U.S.C. § 1605(a)(3). In short, the domestic takings rule has no applicability in the discrete circumstances of this case.

The text of § 1605(a)(3), as we have explained, applies foursquare to genocidal takings committed by a state against its nationals. And nothing in the provision's history or context compels us to read the statute in a manner at odds with its plain terms. To be sure, international law traditionally did not regulate conduct between a sovereign and its subjects. *See* 1 Oppenheim's Int'l Law 849. But World War II marked a change in that landscape, leading to recognition of certain international-law norms that "protect individuals from inhuman treatment by states, even if the [offending] state is that state whose nationality the individual has." *Id.* at 851. In particular, "the condemnation of genocide as contrary to international law quickly achieved broad acceptance by the community of nations" in the aftermath of the War and the Nuremberg Trials. *Kadic*, 70 F.3d at 241; *see Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1173-74 (D.C. Cir. 1994). By the time of the expropriation exception's enactment in 1976 as part of the FSIA, genocide had long been identified as an international-law crime—as evidenced by the Genocide Convention, article 2, adopted in 1948.

Section 1605(a)(3)'s reference to "violation[s] of international law" therefore includes genocide

notwithstanding that a sovereign's actions against its own citizens traditionally fell outside the purview of international law. Judicial interpretation of the Alien Tort Statute, 28 U.S.C. § 1350, confirms that understanding. Even though international human rights law did not even exist when the First Congress enacted the Alien Tort Statute in 1789, the statute's reference to "law of nations" encompasses conduct universally accepted as violating international law *today*, *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 732-33 (2004), including genocide and certain other offenses committed by a sovereign against its own subjects, *e.g.*, *Kadic*, 70 F.3d at 242 (genocide); *Abebe-Jira v. Negewo*, 72 F.3d 844, 845-46 (11th Cir. 1996) (torture); *Tel-Oren*, 726 F.2d at 791 n.20 (Edwards, J., concurring) (genocide, torture, summary execution, slavery). It follows *a fortiori* that the term "international law" in the FSIA's expropriation exception—enacted by the 94th Congress well after the development of international human rights law—likewise encompasses genocide. As with the Alien Tort Statute, there are sound reasons for caution before concluding that a state's actions against its own nationals infringe a prohibition of sufficiently universal acceptance to amount to a "violation of international law" within the meaning of § 1605(a)(3). *See Sosa*, 542 U.S. at 727-28. We hold here only that genocide is such a crime.

Unsurprisingly, there is no indication in the legislative history that Congress affirmatively considered § 1605(a)(3)'s applicability in the distinctive context of genocidal takings. Rather, the general international-law prohibition against expropriations without just compensation would have been foremost in Congress's mind. *See* H.R. Rep. No. 94-1487, at 19-20 (1976). But in the absence of any indication that Congress would have desired to *exclude* genocidal takings from the statute's scope, and in light of the established status of genocide as an international-law crime by the time of the

FSIA's enactment, we adhere to the expropriation exception's plain terms in holding that genocidal expropriations constitute "tak[ings] in violation of international law." 28 U.S.C. § 1605(a)(3).

We recognize one seeming anomaly, also noted by the Seventh Circuit in addressing parallel claims arising from the Hungarian Holocaust: that the FSIA scheme, as we construe it, enables the plaintiffs to "seek compensation for taken property but not for taken lives." *Abelesz*, 692 F.3d at 677. But that is a byproduct of the particular way in which Congress fashioned each of the various FSIA exceptions. *See id.* Those exceptions were designed to deal generally with the full range of cases that might arise under them. There is no reason to assume that, in every discrete context in which those exceptions might be applied (such as claims arising from genocide), there would be perfect coherence in outcome across all of the exceptions. Congress determined as a general rule that, for non-commercial torts, jurisdiction would exist against foreign sovereigns only for "personal injury or death . . . occurring in the United States." 28 U.S.C. § 1605(a)(5). Congress established no such limitation for claims involving "property taken in violation of international law." *Id.* § 1605(a)(3). The unavailability of jurisdiction for personal-injury claims under a different, independent exception affords no reason to deny jurisdiction for property-related claims fitting squarely within the terms of the expropriation exception.

3.

We turn finally to § 1605(a)(3)'s commercial-activity nexus requirements. The nexus requirement differs somewhat for claims against the foreign state itself (*e.g.*, Hungary) as compared with claims against an agency or instrumentality of

the foreign state (*e.g.*, MÁV). *See Chabad*, 528 F.3d at 947. As to the claims against Hungary, the question is whether the "property [in issue] or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(3). As to the claims against MÁV, the question is whether the "property [in issue] or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." *Id.* Considered at a more general level, both kinds of claims require: (i) that the defendants possess the expropriated property or proceeds thereof; and (ii) that the defendants participate in some kind of commercial activity in the United States.

The Hungarian defendants argue that the plaintiffs' factual allegations fail to satisfy § 1605(a)(3)'s nexus requirements. When a "defendant challenges . . . the legal sufficiency of the plaintiff's jurisdictional allegations," we must "take the plaintiff's factual allegations as true and determine whether they bring the case within . . . the [FSIA] exception[] to immunity invoked by the plaintiff." *Phoenix Consulting Inc.*, 216 F.3d at 40. Here, the Hungarian defendants would be entitled to a dismissal for failure to establish jurisdiction only if "no plausible inferences can be drawn from the facts alleged that, if proven," would satisfy the expropriation exception's nexus requirements. *Price*, 294 F.3d at 93. Applying that standard, we find that the plaintiffs' allegations suffice to withstand dismissal as to the claims against MÁV but not as to the claims against Hungary.

With respect to the requirement that defendants possess the expropriated property or proceeds thereof, the complaint alleges that the Hungarian defendants liquidated the stolen

property, mixed the resulting funds with their general revenues, and devoted the proceeds to funding various governmental and commercial operations. Those allegations suffice to raise a "plausible inference[]" that the defendants retain the property or proceeds thereof, absent a sufficiently convincing indication to the contrary. *Id.* The defendants suggest that the United States might have confiscated the expropriated property from Hungary; that Hungary might have turned over all of the confiscated property to a relief organization in compliance with its obligations under the 1947 Treaty; or that Hungary might have liquidated all of the proceeds on other government operations. That speculation fails to demonstrate the implausibility of the plaintiffs' claims.

The Seventh Circuit rejected similar arguments made by Hungarian defendants facing claims brought by Hungarian Holocaust victims under the expropriation exception. *Abelesz,* 692 F.3d at 688. There, as here, the defendants "offered no case or fact that demonstrates conclusively that the value of the expropriated property is not traceable to their present day cash and other holdings"; they thus failed to defeat the plausibility of the plaintiffs' claims. *Id.* at 689. Although "[i]t is certainly possible that the value of plaintiffs' expropriated property was lost during one or more of these [intervening events]," it "is also plausible that defendants retain the value of plaintiffs' expropriated property." *Id.*

Of course, the plaintiffs ultimately "may or may not be able to prove the point." *Id.* at 688. Upon any factual challenge by the Hungarian defendants—*e.g.*, concerning whether the defendants in fact still possess the property or proceeds thereof—the plaintiffs will bear the burden of production, and the defendants will bear the burden of persuasion to "establish the absence of the factual basis by a

preponderance of the evidence." *Chabad*, 528 F.3d at 940. We conclude only that the "[p]laintiffs' claims that [the] defendants currently own or operate their expropriated property (or property exchanged for such property) are not so implausible as to permit resolution on the pleadings alone." *Abelesz*, 692 F.3d at 689.

With respect to the requirement that the defendants be engaged in commercial activity in the United States, the plaintiffs allege that MÁV maintains "an agency for selling tickets, booking reservations, and conducting similar business in the United States." Compl. ¶ 85. Because defendants make no attempt to argue that the rail company fails to "engage[] in a commercial activity in the United States," the nexus requirement is satisfied as to MÁV. 28 U.S.C. § 1605(a)(3).

But as to Hungary, by contrast, the plaintiffs put forward only the bare, conclusory assertion that "property is present in the United States in connection with commercial activity carried on by Hungary within the United States." Compl. ¶ 83. There is nothing more. Although the plaintiffs "need not set out all of the precise facts on which the[ir] claim[s] [are] based in order to survive a motion to dismiss," *Price*, 294 F.3d at 93, here, they allege precisely zero facts concerning what commercial activity, if any, Hungary carries on in the United States. Our inquiry is "similar to that of Rule 12(b)(6)," *id.*, under which "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is all the plaintiffs have advanced here. We express no view on whether they can (or should be allowed to) amend the complaint in this regard on remand. But as it stands, the complaint's allegations about Hungary's commercial activity fail to demonstrate satisfaction of §1605(a)(3)'s nexus requirement.

34

4.

As a final argument against the applicability of the FSIA's expropriation exception, the Hungarian defendants argue that there can be no jurisdiction under § 1605(a)(3) unless the plaintiffs first demonstrate that they have exhausted available domestic remedies in Hungary. It is important to place that exhaustion argument in proper perspective. The defendants could in theory assert (at least) three forms of an exhaustion argument in this case. Only one of those arguments is before us, and we reject it.

First, the defendants might contend that the FSIA itself obligates a plaintiff to exhaust domestic remedies before attempting to bring suit against a foreign sovereign in United States courts. This court, however, has held that the FSIA itself imposes no exhaustion requirement. *See Chabad*, 528 F.3d at 948-49; *accord Abelesz*, 692 F.3d at 678. The Hungarian defendants thus understandably make no such argument before us.

Second, the defendants could argue that, with regard to the FSIA's expropriation exception in particular, a plaintiff cannot show a "violation of international law" as required by § 1605(a)(3) without exhausting domestic remedies in the defendant state (or showing the absence of any need to do so). That is the argument presented by the Hungarian defendants here, and we find it unpersuasive in the circumstances.

In certain situations, exhaustion may be required before an expropriation gives rise to a violation of international law. When a case involves a basic international-law expropriation claim asserting a taking of a foreign national's property without payment of just compensation, there may be no violation until the plaintiff seeks (and is denied) compensation

through the sovereign defendant's domestic laws. *See Altmann*, 541 U.S. at 714 (Breyer, J., concurring); *Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 857 (7th Cir. 2015); Restatement (Third) of the Foreign Relations Law of the United States § 712. That would parallel the rule applicable to domestic claims asserting a taking of property without just compensation under the Fifth Amendment, as to which there is no constitutional violation until the plaintiff unsuccessfully attempts to obtain compensation through local remedies. *See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194-95 (1985).

Any comparable rule under international law would have no application here, however. As we have explained, the relevant international-law violation in this case for purposes of § 1605(a)(3) is not the basic prohibition against an uncompensated expropriation of a foreign national's property. Rather, the takings of property in this case violate international law because they constitute genocide. In the context of a genocidal taking, unlike a standard expropriation claim, the international-law violation does not derive from any failure to provide just compensation. The violation is the genocide itself, which occurs at the moment of the taking, whether or not a victim subsequently attempts to obtain relief through the violating sovereign's domestic laws. *See Fischer*, 777 F.3d at 852, 857. In this case, the challenged takings therefore "violat[e] [] international law" within the meaning of § 1605(a)(3) regardless of whether the plaintiffs exhausted Hungarian remedies.

This brings us to the third type of exhaustion argument that the Hungarian defendants could assert in this case. The defendants could contend that, even if the claims at issue fit within § 1605(a)(3) so as to enable the exercise of jurisdiction, the court nonetheless should decline to exercise

jurisdiction as a matter of international comity unless the plaintiffs first exhaust domestic remedies (or demonstrate that they need not do so). *See id.* at 858; Restatement (Third) of the Foreign Relations Law of the United States § 713 cmt. f. The Seventh Circuit found that prudential argument to be persuasive in closely similar circumstances, *see Fischer*, 777 F.3d at 859-66, but the argument is not before us in this appeal. The plaintiffs briefly contend in their reply brief that no exhaustion requirement should apply here because of the inadequacy of available Hungarian remedies, but the defendants have not argued (and have had no occasion to argue) the point in this court. Instead, the sole contention before us is that the plaintiffs cannot show a "violation of international law" under § 1605(a)(3) without exhausting Hungarian remedies, an argument we have rejected. We leave it to the district court to consider on remand, should the defendants assert it, the third form of exhaustion argument: whether, as a matter of international comity, the court should decline to exercise jurisdiction unless and until the plaintiffs exhaust available Hungarian remedies.

III.

To this point, we have concluded that the FSIA's treaty exception does not preclude consideration of the plaintiffs' claims, and that jurisdiction over their property-based claims exists under the FSIA's expropriation exception. The Hungarian defendants, however, also urge us to dismiss the case for reasons apart from foreign sovereign immunity. They contend that the case presents a non-justiciable political question. Although the district court did not reach that issue, both sides ask us to address it and present arguments in their briefing. We conclude that, at least on the record before us at this time, the case does not present a non-justiciable political question.

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)). The political question doctrine constitutes a narrow exception to that rule, and, when properly invoked, deprives a court of authority to decide the issues before it. *Id.* A controversy "involves a political question . . . where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Id.* (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)) (internal quotation marks omitted) (ellipsis in original). A political question may also arise where there is "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker v. Carr*, 369 U.S. 186, 217 (1962). None of those considerations leads us to conclude that this case presents a non-justiciable political question.

The Hungarian defendants point to the 1947 Peace Treaty and also the aforementioned 1973 Executive Agreement between the United States and Hungary. Those agreements, in the defendants' view, demonstrate that the issue of compensation for Hungary's wartime actions has been textually committed to the political branches and that judicial consideration of the issue could undermine the Executive Branch's resolution. We disagree.

With regard to the question of textual commitment to the political branches, "it is error to suppose that every case or

controversy which touches foreign relations lies beyond judicial cognizance." *Id.* at 211. There is no across-the-board constitutional bar preventing the Judiciary's consideration of actions arising out of the wartime conduct of a foreign sovereign. *See, e.g.*, *Altmann*, 541 U.S. at 701-02; *Alperin v. Vatican Bank*, 410 F.3d 532, 546-58 (9th Cir. 2005). The plaintiffs' property-based claims in this case generally "seek restitution for looted assets," and "[r]eparation for stealing, even during wartime, is not a claim that finds textual commitment in the Constitution." *Alperin*, 410 F.3d at 551; *id.* at 551-52.

Nor do the 1947 Peace Treaty or the 1973 Executive Agreement raise any significant risk that judicial consideration of this case could undermine Executive Branch actions. As we have explained in rejecting the Hungarian defendants' arguments under the FSIA's treaty exception, the 1947 Peace Treaty does not serve as the exclusive mechanism by which former Hungarian nationals can seek compensation for the wartime expropriation of their property. Because the plaintiffs' claims arise outside the 1947 Treaty, judicial consideration of the claims does not undermine the Executive's negotiated resolution in that instrument. The 1973 Executive Agreement, meanwhile, is a bilateral accord between the United States and Hungary. It addresses, at most, the claims of current United States nationals. *See de Csepel*, 714 F.3d at 602-03. The agreement did not—and could not—effect any Executive Branch resolution of the claims of non-United States nationals, who make up the majority of the plaintiffs in this case. As a result, regardless of the possible implications of the agreement for the ultimate merits of the claims asserted by United States nationals, it affords no basis for declaring the entire case a non-justiciable political question.

The Executive Branch, moreover, has given no indication that adjudication of the plaintiffs' lawsuit would encroach on those agreements or raise any broader foreign relations concerns. The Executive often files a statement in court if it believes that judicial consideration of a case would interfere with the operation of the United States's treaties and agreements or would otherwise impinge on the conduct of foreign relations. *See Alperin*, 410 F.3d at 556-57. Notably, the United States filed a statement of interest in this case, but not with respect to the plaintiffs' claims against the Hungarian defendants.

In the district court, the government submitted a statement pursuant to 28 U.S.C. § 517 in which it urged dismissal of the suit against Austrian defendant RCH "on any valid legal ground." Statement of Interest of the United States of America at 16 (July 15, 2011). The United States's foreign policy interests, the government averred, would be best served by continuing its "long-standing, and ongoing, pursuit of cooperative compensation arrangements with Austria and other governments." *Id.* at 15. The district court granted dismissal of the claims against RCH on grounds of personal jurisdiction, and the plaintiffs did not appeal that dismissal. The government's statement of interest conspicuously made no argument—and raised no concerns—about the claims against the Hungarian defendants, the subject of this appeal. That silence by the government, when it otherwise made known its concerns about this case, fortifies our conclusion that the claims against the Hungarian defendants do not present a non-justiciable political question.

\* \* \* \* \*

For the foregoing reasons, we affirm in part and reverse in part the district court's decision. While we find that the

FSIA's treaty exception does not preclude the plaintiffs' claims, we affirm the district court's dismissal of the plaintiffs' non-property claims because they do not come within the FSIA's expropriation exception. We reverse the dismissal of the property-based claims, however, for which jurisdiction exists under that exception. We leave it to the district court to consider on remand whether, as a matter of international comity, it should refrain from exercising jurisdiction over those claims until the plaintiffs exhaust domestic remedies in Hungary. The district court may also elect to consider any other arguments that it has yet to reach and that are unaddressed in our opinion today, such as the defendants' *forum non conveniens* arguments.

*So ordered*.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring: While I join the Court's opinion in full, I write separately to emphasize the baselessness of Hungary's invocation of the Treaty Exception to the Foreign Sovereign Immunities Act (FSIA).[1]  Implicit in Hungary's argument is the premise that it made a good-faith promise to return (within six months' time), or to provide compensation for, the unlawfully expropriated property belonging to the survivors of Hungary's attempted extermination of over one-half million Jewish nationals in the last months of World War II.  The signatories to the 1947 Peace Treaty further agreed that any property that remained unclaimed after six months would be given to Holocaust relief organizations.  According to Hungary, as a result of those provisions, the 1947 Peace Treaty insulates Hungary from the jurisdictional reach of the FSIA.

There is no suggestion that Hungary made any timely attempt to satisfy its obligations under the 1947 Peace Treaty. Indeed, the Hungarian Constitutional Court recognized that even *in 1993* Article 27's requirements remained unfulfilled. And given the unprecedented chaos of post–World War II Europe, the commitment that property seized—and often liquidated—by the Nazis *could* be located and returned in six-months' time, or that fair compensation for the seized property could be paid within any reasonable time, was illusory.  Although looking back seventy years may make it easy to assume that recovery from continent-wide, almost decade-long devastation progressed smoothly, nothing could be more inaccurate:

> Imagine a world without institutions.  It is a world where borders between countries seem to have dissolved, leaving a single, endless landscape over which people travel in search

---

[1]  Specifically, I agree with the Court's treatment of, and conclusions regarding, Articles 27 and 40 of the 1947 Peace Treaty.

of communities that no longer exist. There are no governments any more, on either a national scale or even a local one. . . . No one has seen a newspaper for weeks. There are no railways or motor vehicles, no telephones or telegrams, no post office, no communication at all except what is passed through word of mouth. . . . Law and order are virtually non-existent, because there is no police force and no judiciary. In some areas there no longer seems to be any clear sense of what is right and what is wrong. People help themselves to whatever they want without regard to ownership—indeed, the sense of ownership itself has largely disappeared. Goods belong only to those who are strong enough to hold on to them, and those who are willing to guard them with their lives. Men with weapons roam the streets, taking what they want and threatening anyone who gets in their way. . . . For modern generations it is difficult to picture such a world . . . . However, there are still hundreds of thousands of people alive today who experienced exactly these conditions—not in far-flung corners of the globe, but at the heart of what has for decades been considered one of the most stable and developed regions on earth. In 1944 and 1945 large parts of Europe were left in chaos for months at a time. The Second World War—easily the most destructive war in history—had devastated not only the physical infrastructure, but also the institutions that held countries together. The political system had broken down to such a degree that American observers were warning of the possibility of

> Europe-wide civil war. The deliberate fragmentation of communities had sown an irreversible mistrust between neighbours; and universal famine had made personal morality an irrelevance. "Europe", claimed the *New York Times* in March 1945, "is in a condition which no American can hope to understand." It was "The New Dark Continent".

KEITH LOWE, SAVAGE CONTINENT: EUROPE IN THE AFTERMATH OF WORLD WAR II xiii–xiv (St. Martin's Press 2012). Well into the 1950s, Europe remained "economically, politically and morally unstable." *Id.* at 69. Even the Allied nations—the only group "universally recognized as untainted by association with the Nazis"—were "completely unprepared to deal with the complicated and widespread challenges that faced them in the immediate aftermath of the war." *Id.* at 69–70.

Hungary was no exception. First occupied by Germany in 1944 and then "liberated" by Stalin's troops as the war drew to a close, Hungary's "[e]stablished state institutions collapsed as their officials fled in the face of the Red Army's advance, forcing the country's new occupiers to construct a new state almost from scratch." Mark Pittaway, *The Politics of Legitimacy and Hungary's Postwar Transition*, in CONTEMPORARY EUROPEAN HISTORY 453, 455 (Cambridge University Press 2004). Indeed, "[t]he last six months of the war left Hungary devastated," resulting in the destruction of "40 percent of Hungary's national wealth," damage to 90 per cent of Hungary's industrial plants and loss of 40 per cent of Hungary's rail network and 70 per cent of Hungary's railway vehicles. LÁSZLÓ BORHI, HUNGARY IN THE COLD WAR, 1945–1956: BETWEEN THE UNITED STATES AND THE SOVIET UNION 53–54 (Central European University Press 2004). The task of

rebuilding Hungarian society fell to the Soviet Union, which, as the district court noted, had little interest in complying with the terms of a treaty that did not further the interest of the communist state. *See Simon v. Republic of Hung.*, 37 F. Supp. 3d 381, 391 (D.D.C. 2014).

No group felt the effects of this upheaval more than the Jewish survivors of Hitler's death camps, the majority of whom "believed it their duty to return to their countries of origin and try to rebuild their communities the best they could." LOWE, *supra* at 191. Given the rampant anti-Semitism that plagued the former Nazi-occupied areas, "[t]he historiography of this period in Europe is littered with stories of Jews trying, and failing, to get back what was rightfully theirs." *Id.* at 198. "[T]he property of Jews was dispersed" far and wide "through a combination of confiscation, plunder, theft and resale." *Id.* Indeed, "[i]n larger cities like Budapest," this state of affairs "often rendered it impossible for returning Jews to trace their property." *Id.* at 198–99. And even in smaller, rural towns where property could be traced, the Hungarian courts often "ruled that horses and other livestock plundered from Jewish farms should remain with those who had 'saved' them." *Id.* at 200.

Much ink has been spilled on the general upheaval in post-World War II Europe[2] and the chaos that befell the Soviet-occupied nations in particular.[3] Against this backdrop, Hungary asks this Court to trust that it in fact intended to restore expropriated property to its rightful owners within six months, or to pay them fair compensation, in "*all cases.*" Treaty of Peace, U.S.-Hung., art. 27, Feb. 10, 1947, T.I.A.S.

---

[2] *See, e.g.*, LOWE, *supra.*

[3] *See, e.g.*, Pittaway, *supra*; BORHI, *supra.*

No. 1651 (emphasis added). In Hungary's view, the 1947 Peace Treaty represents the exclusive means by which Hungarian Jewish victims of the Holocaust could obtain recovery for property seized from them. It revises history—and defies reality—to claim that Hungary had any intent or ability to effectuate Article 27 of the 1947 Peace Treaty. Accordingly, it would be unthinkable to conclude that the 1947 Peace Treaty fits within the FSIA's Treaty Exception.